ROBERT BRIGHETTI *vs.* CONSOLIDATED RAIL CORPORATION.

Plymouth. February 6, 1985. — June 13, 1985.

Present: PERRETTA, KAPLAN, & DREBEN, JJ.

*Practice, Civil,* Judgment notwithstanding verdict, Instructions to jury. *Negligence,* Railroad, Screw conveyor, One owning or controlling real estate. *Landlord and Tenant,* Landlord's liability to tenant or one having his rights, Duty to repair.

At the trial of an action against a railroad company, the evidence was sufficient to support the jury's verdict in favor of the plaintiff, who had been injured when he caught his foot in a screw conveyor being used to unload grain from a railroad car on a siding owned by the defendant with an oral lease to the plaintiff's employer, where the jury, on governing instructions from the judge to which both parties acquiesced in substance, could properly have found that the so-called lease was a tenuous arrangement in which the railroad had dominant power; that the conveyor device was dangerous, requiring supervision and definite safeguards; that it would have been natural for a landlord in the defendant's position to inspect the device at or about the time its ownership commenced, some six months prior to the accident; that the defendant had access to the premises and an opportunity to accomplish certain necessary repairs; and that its negligence consisted in culpable inaction. [198-200]

CIVIL ACTION commenced in the Superior Court Department on September 28, 1979.

The case was tried before *Chris Byron,* J.

*Paul F. Leavis* for the plaintiff.

*Michael A. Fitzhugh* for the defendant.

KAPLAN, J. On September 29, 1976, the plaintiff Brighetti was injured when his foot and ankle were mashed by a rotating screw auger that was being used at the time to unload grain from a railroad car. The accident occurred at a siding owned by the defendant Consolidated Rail Corporation (Conrail), with

an oral "lease" to G.D. Poultry, Inc. (Poultry), Brighetti's employer, to install and operate the auger.[1]

After the plaintiff presented his proof and rested, the defendant chose to rest, and moved for a directed verdict essentially on the ground of insufficient evidence to go to the jury. The judge denied the motion and in that connection he indicated at sidebar that the doctrine of the *Garwacki* case was applicable. *Young* v. *Garwacki*, 380 Mass. 162, 168-171 (1980). This is generally to the effect that a landlord has a duty of due care, accommodated to the circumstances, with respect to persons lawfully on the rented premises. The judge recited the instructions he intended to give the jury in the light of *Garwacki*. The parties had no significant objections to this statement.

Recalling the jury, the judge charged them in substance as he had said he would do (he added a consistent instruction suggested in part by the plaintiff).[2] By special verdict, the jury found that Conrail had been negligent and its negligence proximately caused the injuries and that the plaintiff was free of negligence and entitled to damages of $350,000. On the defendant's motion for judgment n.o.v. (renewing, in effect, the motion for a directed verdict) or, in the alternative, for a new trial, the judge granted judgment n.o.v. and denied a new trial. The plaintiff appeals. There is no question of law aside from that of the adequacy of the evidence, taken in light most favorable to the plaintiff, to support the verdict under the law as received from the judge and accepted in substance by the parties. In that view we hold that the verdict should not have been interfered with. Nor is a new trial required.

After a synopsis of the proof, we shall recount the law as stated and charged by the judge and accepted by the parties, and then show that the evidence was sufficient thereunder.

1. *The evidence.* Poultry batched, blended, bagged, and sold mixed grains for use as animal feed. Since locating its plant in Middleborough in 1964, Poultry received much of its grain

---

[1] The original complaint named as defendants Poultry and others connected with the installation of the auger. Conrail was later added as a defendant and at trial remained as the sole defendant.

[2] See the last paragraph of text of point 2 of this opinion.

by railroad cars brought to the siding. This was behind and adjacent to Poultry's property and about four feet below it. A wall ran along the boundary between the two, creating a terrace effect. The siding was seventy-five or more feet in length, and in width comprised the track and narrow three-foot workspaces on either side. The workspace nearer the plant was flush to the wall.

Poultry received about two rail car deliveries of bulk grain a week, boxcars being used twice as often as hopper cars. Originally, Poultry used a conveyor belt to transfer the grain from the cars to the plant, but in 1968 it submitted to the (predecessor) railroad a plan for using, instead, a grain auger, that is, a rotating screw-like device resembling a meat grinder. The railroad suggested changes, and in response Poultry altered the design of the auger, lengthening it and adjusting its angle in relation to the ground.

As installed, the auger began at a point between the rails, several feet below ground level. It sloped upward toward the plant at an angle of 30°, emerging about halfway between the inner track and the wall. Then it passed through the wall to the grain mixing plant.

The auger was encased in a metal housing for most of its length, but was exposed at its end beneath the track to admit the grain from a parked hopper car, that is, a car with a square-shaped funnel at its base. Above the exposed auger, recessed in the ground, was a fixed metal funnel for channeling the content of the car to the screw blades. At the base of this fixed funnel was a metal grate or grid designed to pass grain but to screen out "oversize particles and people."

The auger was switched on and off by means of simple controls atop the boundary wall. It rotated at a speed of perhaps two hundred revolutions per minute. There was no reverse switch.

Poultry employees would instruct the rail car operators to "spot" hopper cars over the auger opening and these operators would do so. Poultry people unloaded the cars following a pattern as indicated. However, there was difficulty with boxcars having the usual side doors and no floor opening. Here a plywood board was used as a ramp to guide the grain from the

side door to the funnel beneath the track. This was awkward and resulted in considerable spillage which made for tricky footing in the unloading area.

In late 1975 or early 1976, John Carlton, an owner and manager of Poultry, without consulting the railroad, cut a second opening, ten by twenty inches, in the auger housing just below the point at which the overhanging side door of a boxcar could be brought to rest. That point was in the inner workspace, where auger and housing protruded above the ground, so that this second opening was visible from the vicinity of the track. The housing, with the auger just below, was two inches above ground at the edge of the opening nearer the track, and twelve inches at the opposite edge nearer the wall. A boxcar could now be unloaded through a removable funnel leading from the side door through a grate or grid which Carlton had welded into the housing over the exposed portion of the auger.

When the new method of handling boxcar deliveries was tried out, the grain propelled by the auger tended to "bridge" or clog at the grate; this was due in part to the kinds of grain customarily shipped by boxcar. So, after the first or second tryout, Carlton removed the grate. This occurred some time before the defendant Conrail came in on April 1, 1976, as successor owner of the railroad. As some substitute for the grate, Carlton made a rectangular metal lid weighing ten to fifteen pounds with a short lip on each side. This was intended to be placed on the opening of the housing when the auger was not is use or was being used to unload a hopper car. Even after the grate was removed, grain still accumulated around the second opening during the unloading of boxcars, so that sometimes the auger at that point would be as much as six inches below the surface of the surrounding grain.

At 10 A.M., September 29, 1976, the plaintiff, one of Poultry's ten-man staff, was approached by Paul LaGraze, a fellow employee, and told that grain was not flowing properly out of a hopper car. The plaintiff went down to the near workspace, looked under the car, and saw that grain was bridged at the car's floor opening. He decided to go back to the plant to fetch a ninety-degree tool with which to reach under the car to loosen

the grain. From a position facing the car he turned to his right toward the plant. His left foot slipped on an accumulation of wet grain around the second opening. In the same movement he sought to steady himself with his right foot, which encountered and perhaps dislodged the metal cover and plunged into the revolving auger.[3] There was a lapse of time until a worker reached the switch. The plaintiff was extricated by the use of an acetylene torch on the housing. His injury was severe and long lasting and disabled him permanently for his proper employment.

A qualified consulting engineer gave expert testimony, citing, among other sources, relevant standards promulgated by the American National Standards Institute, that the second opening was extremely hazardous, and aggravated by grain afoot and congestion of the workspace. It could readily have been made reasonably safe by devices such as a fixed cover, a welded grate, a fence or cage, or an "interlock" system to shut off power when the cover was dislodged.

2. *The law governing this action.* As noted, the judge stated his view of the law at the time of the motion for a directed verdict. Having denied the motion, the judge instructed the jury in consonance with that view. The parties on both occasions acquiesced in the substance of the law as thus declared.[4]

---

[3] The cover was not locked in place but was held "by gravity." It should be noted that the auger at this second opening was at a slope of 30°, which may have contributed to the insecurity of the cover as it sat on the housing. It was indicated also that a lumping of grain under the cover could have unsettled it.

[4] Where a defendant moves for a directed verdict on a particular ground; the motion is denied; the judge's instructions negate that ground but the defendant does not object; and the defendant then moves for judgment n.o.v., the question may arise whether the particular ground argued on the motion for a directed verdict is waived by reason of the defendant's failure to object to the judge's instructions. The proper answer, we believe, is that it is not waived. See Mass.R.Civ.P. 50(b), 365 Mass. 814 (1974), second sentence: the n.o.v. motion seeks "to have judgment entered in accordance with his [movant's] motion for a directed verdict." No problem of such a waiver arises here, that is, the defendant has maintained its contention that the evidence is insufficient under the formulation of law twice stated by the judge.

So no question of the accuracy of these statements is before us. See notes 5 and 7, *infra*.

We paraphrase the judge's statements reflecting *Garwacki*.[5] A landlord must use reasonable care to see that, at the time of letting, the property is in reasonably safe condition and he must also act reasonably to maintain it in such condition. He is not an insurer, but must act as a reasonable person in all the circumstances. He must anticipate conditions, reasonably foreseeable, likely to cause injury to the tenant or others lawfully on the premises. However, he is not liable in negligence unless he knew or reasonably should have known of the defect which caused the injury and had a reasonable opportunity to repair it. His agent's knowledge unrelated to the agency is not imputed to the landlord.

Reflecting the older law (see *Garwacki*, 380 Mass. at 170), the judge said that in considering whether a landlord was negligent in maintaining leased property, one should note that as lessor he gives up his right to enter upon the land; in the absence of an agreement, he can neither inspect for defects nor repair; and, without consent, he may not interfere with the tenant's personal property.[6]

The judge went on to say that the relevant time period was from April 1, 1976, when Conrail became owner, to September 29, 1976, the date of the plaintiff's injury.[7]

There was an addendum in the instructions to the jury. At the plaintiff's request, the judge said that if the defendant failed

---

[5] The judge was applying the *Garwacki* doctrine to the situation at the siding although the property was nonresidential. Conrail did not contest the point. It attempts to debate the matter in its brief on appeal, but is foreclosed from doing so. The question whether *Garwacki* applies to nonresidential property was left open in that decision. 380 Mass. at 171 n.12. We express no opinion on the question.

[6] The judge refused (over plaintiff's objection, but the point is not pressed) to charge that consent to enter to inspect or repair might be implied from the conduct of the parties.

[7] The judge dealt with Conrail's acquisition of the railroad on April 1, 1976, as signifying the commencement of a tenancy for purposes of *Garwacki*. The parties did not object. We express no opinion on the validity of the proposition.

to inspect the property and the failure was a cause of the plaintiff's injuries, the defendant could be found negligent. But, apprehending that this might contradict his earlier charge (so much of it, evidently, as referred to the general standard of reasonableness), he said the jury would still have to find that the landlord should reasonably have inspected. On appeal Conrail tries to argue that the judge erred in instructing that Conrail could be found negligent for failing to inspect. No such objection appears to have been registered below, and therefore it cannot be urged here. In any event, the instruction, as qualified by the judge, was simply an exemplification of the standard of negligence previously stated by him.[8]

3. *Sufficiency of the evidence.* Upon the present record, the jury, applying in a common sense way the law as declared by the judge, could find sufficient facts to support their finding of negligence, and the finding therefore was entitled to respect.[9] The parties and the court characterized the relation between the defendant Conrail and Poultry as one of landlord-tenant, but there was no writing or other evidence of the terms of this "lease."[10] The terms had to be inferred by the jury from the evidence as a whole. On that basis it would seem that Poultry was a "tenant" for the limited purpose of arranging for the transfer of the grain. The submission of the plan for the auger to the railroad in 1968 could illustrate the symbiotic interest of the parties. Let us observe that the railroad's own employees could hardly avoid being in the workspaces and suffering any hazards there. The submission to the railroad was also a mark of the fact that, having no assured period of occupancy as a tenant, Poultry was subject to ouster by Conrail from the siding with small ceremony for any reason or without a reason. The

---

[8] Conrail objected to the refusal of the judge to instruct on the relation of negligence on the part of Poultry to Conrail's negligence. As the judge indicated, the matter had already been adequately treated elsewhere in the instruction.

[9] The question was the defendant's negligence. The findings on the other issues were plainly unimpeachable.

[10] So also it was assumed that some rent had been paid, but the amount and time of the supposed payment were left unstated.

lease, so called, could be found to be a tenuous one in which the railroad had the dominating power.

The other capital fact, as it could be seen by the jury, was that a screw auger, especially one working with a substance like grain and operating in a cramped workspace, was dangerous and required supervision and definite safeguards lest it become a "bear trap" (as the expert witness put it).[11]

Taking Conrail's ownership from April 1, 1976, to mark the beginning of a tenancy, still on the inchoate basis, the jury could find that it would be natural and reasonable for Conrail, as incoming landlord, to inspect at or about that time for safety at places of hazard.[12] Where the judge stated that, as landlord, Conrail could enter only by agreement with Poultry, the jury could find, in reason, that Poultry would have agreed if asked; as a practical matter, it could not refuse. In fact, Conrail was "entering" on the average twice a week to make deliveries (it entered also, as the evidence showed, to help with defective cars, and to collect tariffs). Where the judge said that Conrail could not make repairs unilaterally, that did not relieve Conrail: the jury could find that a word would suffice to get Poultry to take the simple steps needed to make the second auger opening less of a menace. Conrail's duty to exercise due care, as stated by the judge, was a continuing one and the jury could find that suitable repairs could have been made in the six months between April 1 and September 29, 1976.

---

[11] The law reports are rife with arm and leg injuries resulting from the operation of screw conveyors. See *Bituminous Ins. Co.* v. *Georgia-Pacific Corp.*, 2 Ark. App. 245 (1981); *Thornhill* v. *Black, Sivalls & Bryson, Inc.*, 385 So.2d 336 (La. Ct. App. 1980), aff'd 394 So.2d 1189 (La. 1981), *S.C.*, 391 So.2d 1256 (La. Ct. App. 1980); *Costello* v. *Pennsylvania R.R.*, 359 Pa. 562 (1948); *Kennedy* v. *Custom Ice Equip. Co.*, 271 S.C. 171 (1978).

[12] For cases spelling out such an obligation at the inception of a tenancy, see *Mansur* v. *Eubanks*, 401 So.2d 1328, 1329-1330 (Fla. 1981); *Timlin* v. *Standard Oil Co.*, 126 N.Y. 514, 523-524 (1891); *Wilcox* v. *Hines*, 100 Tenn. 538, 547, 549-552 (1898). Compare *Klatman* v. *Barnett*, 458 So.2d 806, 807 (Fla. Dist. Ct. App. 1984) (Glickstein, J., concurring). See also Restatement (Second) of Torts § 352 comment a (1965) (discussion of obligation of purchaser of real property to inspect at or about time of transfer).

Under the charge, Conrail "should have known," i.e. should have exerted itself sufficiently to acquire the knowledge, that there was a hazard at the siding. Its negligence consisted in its culpable inaction, or so the jury could find.

We are obliged to interpret the evidence most favorably to the plaintiff Brighetti to determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972) (relied on in *Poirier* v. *Plymouth*, 374 Mass. 206, 212 [1978], and *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 [1983]). On that basis, or even a less stringent one, the judgment n.o.v. should be reversed, and judgment should enter upon the verdict. The denial of a new trial should be affirmed.[13]

*So ordered.*

---

[13] The defendant suggests no ground that appears tenable for allowing a new trial if the judgment n.o.v. is reversed.