ELIOT R. FREEMAN vs. PLANNING BOARD OF WEST
BOYLSTON & OTHERS.[1]

Worcester. November 9, 1994. - February 24, 1995.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Subdivision Control*, Decision of planning board, Streets, Plan, Drainage.
*Due Process of Law*, Substantive rights. *Civil Rights*, Availability of
remedy, Coercion.

Discussion of the standards for finding a violation of substantive due pro-
cess rights as articulated in Federal cases. [557-561]
In a claim brought under 42 U.S.C. § 1983, alleging that a planning
board and its members violated the plaintiff's substantive due process
rights by withholding approval of his definitive subdivision plan despite
its compliance with applicable rules and regulations, the plaintiff did
not establish that the defendant's conduct was one of the "truly horren-
dous" situations such as would warrant relief under that statute. [561-
563]
In a claim brought under the Massachusetts Civil Rights Act, G. L. c. 12,
§ 11I, for a planning board's violation of G. L. c. 41, § 81M, by with-
holding approval of a definitive subdivision plan that complied with ap-
plicable rules and regulations, the plaintiff did not establish that the
interference with his property rights was "coercive," thus there was no
basis for the imposition of liability under the statute. [564-566]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 20, 1988.

The case was tried before *Charles F. Barrett*, J.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Elizabeth A. Lane & Joyce Frank* for the defendants.

*Thomas N. O'Connor (B.J. Krintzman* with him) for the
plaintiff.

---

[1]Charles Greenough and Kathleen Foreman, as members of the
planning board of West Boylston, and individually.

GREANEY, J. The plaintiff, Eliot R. Freeman, brought an action in the Superior Court against the town of West Boylston (town), acting through its planning board (board), and certain members of the planning board individually.[2] The plaintiff's action sought damages on the basis of claims that the defendants, in connection with the plaintiff's efforts to obtain approval of a definitive subdivision plan pursuant to G. L. c. 41, §§ 81K et seq. (1992 ed.), deprived him of his substantive due process rights under the Fourteenth Amendment to the United States Constitution, and violated the Massachusetts Civil Rights Act, G. L. c. 12, § 11I (1992 ed.). A jury in the Superior Court returned special verdicts finding the town liable on both the Federal and State claims, and they assessed identical damages of $375,000 on each claim. The jury also found the defendants Charles Greenough and Kathleen Foreman individually liable on the same claims, and they assessed damages of $50 on each claim against each of them. Judgments were entered, and, subsequently, the plaintiff's application for attorney's fees and costs was allowed in the amount of $120,000 in attorney's fees and $3,333.75 in costs and expert witness fees.[3] The defendants appealed, and we transferred the case to this court on our own motion. We conclude that the plaintiff's evidence was not sufficient, as matter of law, to warrant the jury's verdicts, and, as a consequence, the defendants' motions for judgment notwithstanding the verdict should have been allowed. Consequently, we reverse the judgments, and we order entry of judgments for the defendants on all claims.

---

[2] In addition to Charles Greenough and Kathleen Foreman, the complaint also named as defendants four other individuals who had been members of the board, sued in their personal capacity, two other board members sued only in their official capacity, and Michael Rafferty, in his capacity as the consulting civil engineer for the board. The case went to the jury against the town acting through its planning board and four members of the board who were sued individually. The jury returned verdicts in favor of two of the individual defendants.

[3] By amended judgments, each of the defendants was made liable, jointly and severally, for the award of attorney's fees, costs, and expert witness fees.

1. We begin by examining the evidence in some detail. We do not consider its weight. Rather, the determination focuses on "whether, 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'" *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting *Kelly* v. *Railway Express Agency, Inc.*, 315 Mass. 301, 302 (1943). Viewing the evidence from this perspective, the jury could have found the following facts.

In 1982, the plaintiff purchased a seventy-six acre parcel of land in the town and he obtained the board's approval for a subdivision of twenty-six acres of the property into six residential lots, all of which were sold between 1984 and 1985. On August 26, 1985, he applied for approval of a definitive subdivision plan, pursuant to G. L. c. 41, §§ 81K et seq., for the remaining fifty acres of the property. The plan proposed a residential subdivision to be called "Lost Oak Road," on land between Prospect and Goodale Streets in the town. The plan showed two new subdivision roads, both ending in culs-de-sac. One of these, called Lost Oak Road, served thirteen lots, and intersected with Prospect Street. The other, called Acorn Path, served two lots and intersected with Goodale Street.

The board referred the plan for review to Michael Rafferty, its consulting civil engineer. In accord with the statutory requirement, see G. L. c. 41, § 81T (1992 ed.), a public hearing was held on September 30, 1985. In connection with the hearing, Rafferty issued a report on the plaintiff's plan, in which he concluded that the plan satisfied the board's regulation regarding sight distances at the intersection of Lost Oak Road and Prospect Street,[4] but that the storm water run-off from the developed site would exceed the run-off

---

[4]The term "sight distance" refers to a driver's line of vision at the intersection of two roadways. When the plaintiff submitted the definitive subdivision plan for Lost Oak Road, the board's regulations required sight distance of a minimum of 275 feet in either direction at the intersection of an

from the site in its undeveloped state for both twenty-five and one-hundred-year storm events.[5]

At the public hearing, board member Kathleen Foreman, a defendant, voiced concern about the safety of the intersection of Prospect Street and Lost Oak Road (intersection). As a result, the board directed Rafferty to reevaluate the proposed intersection. In a letter dated October 12, 1985, Rafferty informed the board members that, "to provide for safe vehicular operation at this intersection," sight distance should be measured from a point approximately fifty feet back from the westerly edge of Prospect Street.[6] At this point, the proposed roadway dipped below the existing grade, "creat[ing] a 'blind spot' within the sight line in both directions." In Rafferty's view, the steep grade of Prospect Street was an additional concern which warranted increasing the sight distance requirement from 275 feet to 325 feet. The plan would require modification, he informed the board, to meet the design criteria outlined in this letter.

On October 24, 1985, the board issued a certificate of planning board action (October, 1985, certificate) disapproving the plaintiff's plan on the grounds that (1) the proposed drainage system was not adequate to guarantee a zero increase in run-off associated with a twenty-five or a one-hundred-year storm event[7]; (2) the sight distances were inade-

---

existing and a proposed roadway.

The sight distance requirement applied to Lost Oak Road and to Acorn Path, but only the intersection of Lost Oak Road and Prospect Street caused controversy between the plaintiff and the board.

[5]The board's regulations required a storm drain system for each street in a new subdivision. The system was to be designed "so that the . . . rate of discharge at points where runoff collected by the street drainage system leaves the subdivision shall not exceed the peak rate of discharge from the site as it presently exists in its undeveloped state. The criteria to be used to establish the peak rate of discharge from the site as it presently exists is that peak rate of runoff associated with a 25 year storm."

[6]This point corresponded to the position of a driver at a stop sign which Rafferty calculated would be placed some forty feet from the westerly edge of Prospect Street. The driver would be required to stop ten feet behind the stop sign.

[7]The board's regulations only addressed run-off associated with a twenty-five-year storm event. See note 5, supra. The board included calcu-

quate at the intersection of Lost Oak Road and Prospect Street to assure safe vehicular traffic[8]; and (3) approval of the development by the town's board of health had not been obtained.[9] In connection with point (2), the board required the plaintiff to obtain "[s]lope and sight distance easements" across land belonging to the Wachusett Country Club. There was evidence that the plaintiff could not obtain these easements, and that, at some point, he so informed the board.

The board's regulations also required that proposed streets conform to the town's master plan as adopted by the board. That plan called for a through street running between Prospect and Goodale Streets in the general area of the plaintiff's property. The plaintiff had requested a waiver of this requirement. In the October, 1985, certificate, the board "[d]efer[red] action on the request to eliminate a through street from Prospect Street to Goodale Street until such time that the safety of the proposed intersection with Prospect Street is resolved to the satisfaction of [the] board."

The plaintiff appealed from the board's decision to the Superior Court. See G. L. c. 41, § 81BB (1992 ed.). On October 9, 1986, after a trial, a judge in the Superior Court entered findings of fact, conclusions of law, and an order for judgment (October, 1986, order). Judgment entered in accord with the order on October 17, 1986. Although the judge concluded that the board could not impose conditions based on a one-hundred-year storm, she affirmed the board's disapproval of the proposed drainage system for failure to provide adequately for drainage measured by the twenty-five-year storm standard. She noted that the applicable regulations only required sight distance of 275 feet in either direction, a requirement obviously satisfied by the definitive plan. Thus,

lations associated with the one-hundred-year storm event because that was the criterion used by the town's conservation commission in evaluating submissions under the Wetlands Protection Act.

[8]This determination was based on the information provided in Rafferty's letter of October 12, 1985.

[9]In November, 1986, the plaintiff obtained approval of his plan from the board of health, and this ceased to be an issue in the case.

she annulled, as exceeding the board's authority, that portion of the October, 1985, certificate which stated that the plan failed to provide adequate sight distance at the intersection of Lost Oak Road and Prospect Street. The case was remanded to the board for further action consistent with the October, 1986, order.

In January, 1987, after discussions with counsel for the town, the plaintiff's attorney attended a regularly scheduled meeting of the board. At this meeting, the board indicated that it intended to consult with town counsel and Rafferty with respect to the import of the October, 1986, order, and that it was considering whether to appeal from the decision of the Superior Court.

By letter dated February 11, 1987, counsel for the town informed the board that, in his opinion, "the Court ha[d] found that the Board exceeded its authority [with respect to the sight distance issue]," and that, unless the board decided to appeal, "there [was] nothing left for the Board to do on this issue." He nonetheless indicated that "it would seem appropriate . . . to have the Board discuss with the Developer the construction details at the intersection of Prospect Street so as to increase the sight distances delineated on the original plan."[10] Town counsel also opined that the board's responsibility was to receive either new data or amendments (or both) to the proposed drainage system, and suggested that a public hearing would not be required if amendments to the plan were confined to the drainage system. In a subsequent letter, dated April 17, 1987, town counsel informed the board that the October, 1986, order was interlocutory and therefore not immediately appealable, and advised that, in any event, the board would be unlikely to prevail on appeal with respect to the issue of intersection design. He reiterated his opinion that a public hearing would not be required (al-

[10]That attorney testified that he had indicated to town counsel that the plaintiff remained willing to discuss with the board the issue of sight distance at the intersection, although, as the plaintiff had satisfied the regulations, he was confident he had no obligation to alter the design of the intersection.

though one could be held) to consider revisions to the drainage system. As of February, 1987, the defendant Foreman, at least, understood that the October, 1986, order "was limited to the issue of drainage," and that the judge had ruled that the board did not have the authority to impose any additional requirements related to the design or safety of the intersection.

On or about March 21, 1987, Rafferty responded to the board's inquiry with a draft of a revised certificate of planning board action, affirming the board's disapproval of the plaintiff's definitive plan. The cover letter indicated that the draft incorporated changes "in response to the Court's findings." This draft disapproved the definitive plan due to deficiencies in the drainage, based on criteria associated with a twenty-five-year storm. In addition, the draft questioned "the safety of the proposed intersection," reiterated the concerns previously expressed, and required the plaintiff to "submit recognized and accepted technical documentation substantiating the safety and adequacy of the intersection design for both vehicular and pedestrian traffic." Rafferty stated, in a letter accompanying the draft, that the October, 1986, order "did not relieve the applicant's engineer from his professional obligation to use reasonable design standards in the design of this intersection, and to convince [the board] that he had done so." Authority for requiring substantiation of the intersection's safety was derived from the stated purposes of the subdivision control law, see G. L. c. 41, § 81M (1992 ed.), which include providing access to subdivision lots "by ways that will be safe and convenient for travel . . . lessening congestion in such ways . . . [and] reducing danger to life and limb in the operation of motor vehicles." Rafferty's letter also suggested, in so many words, that the through street requirement could be used as a bargaining chip by the board to exact concessions from the plaintiff with respect to the design of the intersection.

On March 30, 1987, the plaintiff's attorney submitted a letter to the board, containing revised drainage calculations, and he requested approval of the definitive plan. Several days

later, he attended a regularly scheduled board meeting, and attempted to submit a revised plan page to reflect a change (addition of "detention basin") in the proposed drainage system. Although the board declined to accept the page as a formal submission, Rafferty was asked to review the revised drainage calculations. By a letter dated May 2, 1987, he advised the board that the revisions to the drainage plans did not meet the standards mandated by the court.

In early May, 1987, the plaintiff's attorney again attended a meeting of the board, where he was informed that Rafferty had concluded that the revised drainage plans were not in compliance with the board's regulations. He was also informed that the question of the plaintiff's request for a waiver of the through street requirement, on which the board had previously deferred action, would have to be addressed, and that an amended plan would require an additional public hearing.

The plaintiff expressed his disagreement with the board's position as to the permissible scope of its review of the plan in a motion submitted to the judge, dated July 8, 1987, in which it was contended that the board "ha[d] failed to accept submissions offered by the plaintiff, ha[d] failed to take further action as required by the Court's order for judgment, and ha[d] taken further action inconsistent with the Court's rulings and its own regulations."

The judge held a hearing on the motion on August 5, 1987, at which she orally ordered the board to take the action required by the October, 1986, order no later than August 25, 1987 (modified by agreement of the parties to September 14, 1987). On September 20, the board informed the plaintiff that it had voted to require a through street in the subdivision.[11] In response, by an order dated October 15, 1987 (October, 1987, order), the judge ordered the board to review immediately the plaintiff's plans and calculations relating to drainage, and to limit its review of the plan to the

---

[11]The defendant Foreman testified that she had consistently opposed imposition of a through street requirement, and had voted against it.

issue of drainage. The board's review was to be completed and issued in written form no later than November 17, 1987.

On that date, the board submitted to the judge a proposal in letter form indicating that the board had voted to modify its disapproval of the plaintiff's plan to an approval, subject to certain conditions, including a requirement that the plaintiff provide documentation substantiating the safety of the intersection. The letter also indicated that the board intended to deny the plaintiff's request for a waiver of the through street requirement. On the ground that it was required by statute to do so, the board proposed holding a public hearing prior to approval of the revised definitive plan.

The plaintiff returned to court, objecting to the proposed imposition of the intersection safety documentation and the through street requirements contained in the letter proposal, and requesting that the judge order the board to approve his definitive plan without a public hearing and without regard to the conditions. By a memorandum and order dated March 18, 1988, the judge agreed with the board that a public hearing was required, and deferred consideration whether the other conditions proposed by the board could be imposed until after the hearing, which was held on May 9, 1988.

On June 24, 1988, following the public hearing, which was attended by a number of abuttors, the board issued a certificate of planning board action (June, 1988, certificate) approving the plaintiff's definitive plan for the Lost Oak subdivision, subject to certain conditions, among them a requirement that the plaintiff "submit recognized and accepted technical documentation substantiating the safety and adequacy of the intersection design for both vehicular and pedestrian traffic." The certificate allowed the request for a waiver from the through street requirement.[12] The plaintiff returned to court. On August 24, 1988, final judgment entered for the plaintiff. The accompanying memorandum and order declared invalid, and contrary to the court's prior orders, the

---

[12]At the public hearing, a number of abuttors had objected to imposition of the through street requirement.

part of the June, 1988, certificate which required the plaintiff to submit documentation substantiating the safety of the intersection. This suit followed.

An abuttor's appeal from the board's approval of the plan, dismissed by agreement on March 21, 1989, caused additional delay in the development of the plaintiff's property. There was evidence that the market for real estate in the town was very active through June, 1988, but that the market had declined considerably by April, 1989. At the time of trial, in September, 1992, only two lots in the subdivision had been sold.

The jury heard that a local planning board must approve any subdivision plan that complies with the applicable regulations. See G. L. c. 41, § 81M. Based on the evidence, the jury could have found that the board attempted to impose conditions on its approval of the plaintiff's definitive subdivision plan with respect to the design of the intersection, which it knew were invalid, beyond the scope of its power, and contrary to repeated orders issued by a judge in the Superior Court. They also could have found that the board was unnecessarily dilatory in its consideration of the plaintiff's definitive plan, and that it improperly attempted to exact concessions from the plaintiff with respect to the design of the intersection. As the trial judge observed, however, there was no evidence of personal animus against the plaintiff or of any motive on the board's part other than concern about the safety of the intersection.

2. We first consider the validity of the plaintiff's Federal claims, brought under 42 U.S.C. § 1983 (1988). In this respect, the plaintiff claims that the board and its members violated his right to due process by withholding approval of his definitive plan despite its compliance with the applicable rules and regulations. We are not concerned with a claim that the plaintiff was deprived of property without appropriate procedural protections. Rather, the claim is that the board's misuse of the administrative process was so arbitrary and capricious that a violation of the plaintiff's substantive due process rights resulted. See *Amsden* v. *Moran*, 904 F.2d

748, 753-754 (1st Cir. 1990), cert. denied, 498 U.S. 1041 (1991) (discussing the distinction between procedural and substantive due process claims).

The jury were instructed that, as matter of law, actions taken by the board were "under color of state law," 42 U.S.C. § 1983, and that the plaintiff had a property right in approval of a subdivision plan that conformed to the board's rules and regulations. Additional instructions were framed on the basis of the decision in *PFZ Properties, Inc.* v. *Rodriguez*, 928 F.2d 28 (1st Cir. 1991), cert. dismissed, 503 U.S. 257 (1992). The jury were told that:

> "[The doctrine of substantive due process] doesn't protect individuals from all governmental actions that infringe or injure some property right in violation of some law . . . .
>
> "What is required in order to violate due process by infringing or injuring property is the use of . . . governmental power for purposes of oppression or the abuse of government power that shocks the conscience or action that is legally irrational in that it is not sufficiently keyed to any legitimate state interest. . . .
>
> "Now, mere error on the part of a government official alone that may cause someone's property rights to be injured is not enough. Merely being wrong is not enough. Neither is merely . . . acting in excess of authority granted to a government agency or body, such as a Planning Board, enough. Neither is being merely . . . arbitrary in doing or undertaking the duties of a Planning Board enough. Neither is mere bad faith alone necessarily tantamount or equal to a violation of the plaintiff's due process rights.
>
> "Not every violation by a government body of someone's property rights rises to the level of a violation of due process. It must be of such a nature as I mentioned to you a moment ago. Namely, it's government power being used for purposes of oppression, abuse of government power that shocks the conscience, or action that is

legally irrational in that it is not sufficiently keyed to any legitimate interest of the Town of West Boylston."

Neither party objected to these instructions, which, therefore, became the law of the case. See *Barry* v. *Stop & Shop Cos.*, 24 Mass. App. Ct. 224, 230 (1987).[13] Thus, we consider whether, viewing the evidence in the light most favorable to the plaintiff, there was a sufficient basis to demonstrate, on the part of the board and its individual members, the "requisite arbitrariness and caprice," *Amsden* v. *Moran, supra* at 754 n.5, to constitute a violation of the plaintiff's Federal constitutional rights. In so doing, we assume that the plaintiff had a property right in approval of the definitive plan. See *id.* at 754. See also *PFZ Properties, Inc.* v. *Rodriguez, supra* at 31.[14]

---

[13]In *Littlefield* v. *Afton*, 785 F.2d 596 (8th Cir. 1986), the United States Court of Appeals for the Eighth Circuit noted that most of the Federal Circuit Courts of Appeals which had considered the question had concluded that, without more, "an arbitrary, capricious or illegal denial of a building permit states a substantive due process claim under § 1983." *Id.* at 604. In contrast, the United States Court of Appeals for the First Circuit, has consistently required egregious misconduct of a more serious nature before recognizing a substantive due process violation based on the action of a local governmental authority such as a planning board. See *id.* See also M. Bobrowski, Massachusetts Land Use and Planning Law § 2.6.1, at 76-78 (1993).

Because the parties chose to rely on cases from the First Circuit in framing their requests for jury instructions and other contentions to the judge, we need not (and do not) consider which of these approaches is correct as a matter of Federal constitutional law. Rather, we apply the law as it has been articulated by the First Circuit in a series of cases involving disputes between developers and local planning boards or similar local governmental bodies. See *PFZ Properties, Inc.* v. *Rodriguez*, 928 F.2d 28 (1st Cir. 1991), cert. dismissed, 503 U.S. 257 (1992); *Chiplin Enters., Inc.* v. *Lebanon*, 712 F.2d 1524 (1st Cir. 1983); *Roy* v. *Augusta*, 712 F.2d 1517 (1st Cir. 1983); *Creative Env'ts, Inc.* v. *Estabrook*, 680 F.2d 822 (1st Cir.), cert. denied, 459 U.S. 989 (1982). See also *Amsden* v. *Moran,* 904 F.2d 748 (1st Cir. 1990), cert. denied, 498 U.S. 1041 (1991) (concerning State board's revocation of land surveyor's license).

[14]On appeal, the defendants argue that the plaintiff had no legitimate entitlement to approval of his plan prior to April, 1989, and thus no constitutionally protected property interest prior to that date. In summary, it is argued that the judge's remand order was a nullity because a judge is required to uphold a planning board disapproval which is valid on at least

The standards for finding a violation of substantive due process rights are not precise, see *Johnson* v. *Glick*, 481 F.2d 1028, 1033 & n.6 (2d Cir.), cert. denied sub nom. *Employee Officer John* v. *Johnson*, 414 U.S. 1033 (1973), but decisions of the First Circuit have made clear that what is required is misconduct that is "stunning, evidencing more than humdrum legal error." *Amsden* v. *Moran, supra*. It is not enough to show that the board "exceeded, abused or 'distorted' its legal authority," *Creative Env'ts, Inc.* v. *Estabrook*, 680 F.2d 822, 833 (1st Cir.), cert. denied, 459 U.S. 989 (1982), or that it committed an outright violation of State law. See *Chiplin Enters., Inc.* v. *Lebanon*, 712 F.2d 1524, 1528 (1st Cir. 1983). Even "a . . . bad faith refusal to follow state law in such local administrative matters . . . does not amount to a deprivation of due process where the state courts are available to correct error." *PFZ Properties, Inc.* v. *Rodriguez, supra* at 32, quoting *Chiplin Enters., Inc.* v. *Lebanon, supra* at 1528.

Most recently, the First Circuit has observed:

"Clearly, it is no simple matter to decide what abuses to regard as abuses of 'substantive' due process. Every litigant is likely to regard his own case as involving such an injustice. Thus, we have consistently held that the due process clause may not ordinarily be used [in cases involving] the rights and wrongs of local planning disputes. . . . We have left the door slightly ajar for federal relief in truly horrendous situations. But this cir-

---

one ground. Once the plan was disapproved, the plaintiff was obligated to resubmit a new plan in compliance with all regulations in effect on the date of application (the board's rules and regulations were amended in 1986), obtain board of health approval of the new plan, and submit to an additional public hearing. As the plaintiff did not take these steps, it is argued, he had no property right in approval of his plan. We do not consider whether this contention is correct, because, in its present, highly detailed guise, it does not resemble any argument made to the judge below. See *Franklin* v. *Spadafora*, 388 Mass. 764, 771 (1983). Thus, we agree with the plaintiff's contention that the defendants' motions for directed verdict and for judgment n.o.v. failed to preserve this issue, in this form, for appeal.

cuit's precedent makes clear that the threshold for establishing the requisite 'abuse of government power' is a high one indeed."

*Nestor Colon Medina & Sucesores, Inc.* v. *Custodio,* 964 F.2d 32, 45 (1st Cir. 1992).[15]

We have no hesitation in concluding that this case does not present one of the "truly horrendous" situations in which relief is available by means of a claim under § 1983. Relying on *Roy* v. *Augusta,* 712 F.2d 1517 (1st Cir. 1983), the plaintiff focuses in particular on the board's failure to comply with the various orders issued by the Superior Court judge. The behavior of the board, however, falls far short of the behavior attributed to the city council in the *Roy* case. In that case, it was alleged, the city council deliberately and knowingly flouted the mandate of the State courts, "and that because of special circumstances the state courts were now unavailable to correct the wrong." *Chiplin Enters., Inc.* v. *Lebanon, supra* at 1528.

Here, it is much less clear that the board deliberately flouted the judge's authority. The October, 1986, order remanded the case to the board for action consistent with the judge's written decision. Nowhere in that decision was it stated that the board's sole remaining responsibility was to accept and consider additional material from the plaintiff concerning drainage. Also, nowhere in that decision was it

---

[15]Relying on *Resolution Trust Corp.* v. *Highlands Beach,* 18 F.3d 1536, 1549, rehearing granted and opinion vacated, 42 F.3d 626 (11th Cir. 1994), the plaintiff argues that "[w]hether the challenged conduct is of such a nature as to constitute a violation of substantive due process is an issue of fact for the jury." This is true only if the evidence of misconduct, if believed, is sufficient to meet the demanding standard for liability set out in the cases decided by the First Circuit, on which the parties have relied.

In this regard, we note that the relevant First Circuit cases, on which the parties relied at trial, were resolved on motions to dismiss or for summary judgment. With one exception, all were resolved in favor of the defendants, with the judge, having recited the evidence in the light most favorable to the plaintiff, concluding that, as matter of law, no violation of substantive due process rights had occurred.

suggested that the board had forfeited the right to insist on compliance with the through street requirement. The board's failure to do at this point what the plaintiff contends it was required to do was neither irrational nor obviously at odds with the judge's order. In fact, as subsequent events established, the October, 1986, order did not instruct the board that its *sole* remaining responsibility vis-à-vis the plaintiff's plan was to consider data related to drainage, since the judge subsequently agreed with the board that it was also required to hold an additional public hearing on amendments to the plaintiff's plan. Moreover, the board had received conflicting advice in regard to the October, 1986, order. While indicating that the board had done all it could do with regard to the design of the intersection, town counsel also indicated that the topic remained open for discussion with the plaintiff. The board's consulting engineer forcefully contended, after the order issued, that the board retained the authority to insist on improvements to the intersection.

It was not until October, 1987, that the judge issued written instructions to the board to confine itself to reviewing the plaintiff's plans and calculations relating to drainage. In November, 1987, when the board improperly attempted to require the plaintiff to furnish documentation verifying the safety of the intersection, it did so in the form of a proposal for approval of the plan and subject to the judge's approval. As was previously noted, as late as March, 1988, the judge agreed with the board's position to the extent of ordering a new public hearing, and declined to instruct the board that it must confine itself to considering the drainage issue.

Most importantly, unlike the case in *Roy*, the plaintiff "prevailed in the state courts, and as a result, now has [his planning board approval]." *Chiplin Enters., Inc.* v. *Lebanon*, *supra*. Here, the board attempted to impose conditions on approval of the plan in excess of its authority, thereby contributing to delay in approval of the plan, but it did not attempt to deny the plaintiff the approval to which, at some point, he was entitled, and did not cause him the loss of his property. See *id.* at 1528 n.7 (plaintiff's allegation that de-

fendants "acted contemptuously of the highest court in the state" immaterial when delay ended with grant of permit). Cf. *Roy* v. *Augusta, supra* at 1523-1524. Delay far in excess of that proved in this case has been rejected as a basis for finding a violation of substantive due process rights. See *PFZ Properties, Inc.* v. *Rodriguez, supra* at 32 (delay exceeding four years; no approval ever obtained); *Chiplin Enters., Inc.* v. *Lebanon, supra* at 1526 (five-year delay before approval).

Because a local planning board is required to approve a subdivision plan that complies with local rules and regulations, the plaintiff also argues that the board's action was "legally irrational in that it was not keyed to any legitimate state interest." Although the board's attempt to impose conditions beyond the scope of its authority was improper, its members were motivated by doubts about the safety of the intersection, a legitimate area of concern for a local planning board. See G. L. c. 41, § 81M. As has been previously noted, there was no evidence of personal animus, that other developers were treated more favorably than the plaintiff, or that board members stood to profit personally from their actions. The board members' conduct was not exemplary.[16] Nonetheless, viewed in the light most favorable to the plaintiff, the evidence does not establish the "truly horrendous" situation in which a violation of substantive due process rights may be found to exist. The defendants' motions for directed verdict and for judgment n.o.v. on the plaintiff's Federal claims should have been granted.

---

[16]As has been described, some of the difficulties incurred by the plaintiff are attributable to delay in the Superior Court's disposition of motions and other pleadings by the plaintiff seeking a judicial order directing the board to approve his plan. The denial of a claim under 42 U.S.C. § 1983 (1988), depends on the availability of an efficient State remedy. In the future the Superior Court should be attentive in a case like this to efforts by a developer to obtain relief. Applications for enforcement should be acted on as promptly as possible, and precise directions should be furnished to the board so that it knows exactly what it can and cannot do. If definite orders are entered, a developer will have a basis to seek a contempt judgment if a board fails to comply with an unequivocal judicial directive.

3. The plaintiff's claim under the Massachusetts Civil Rights Act, G. L. c. 12, § 11I (Act), stands on a different footing. To establish a claim under the Act, a plaintiff "must prove that (1) his exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 717 (1989).

The plaintiff's State civil rights claim was premised on a violation by the defendants of G. L. c. 41, § 81M, the provisions of which constitute a law "of the commonwealth." The jury were instructed that the board was required to approve a definitive plan complying with its current rules and regulations. They heard evidence from which they could have concluded that the board delayed approval of the plaintiff's plan once it was in compliance with the applicable regulations. They had before them the final Superior Court judgment of August, 24, 1988 (as to which the board chose not to pursue its appeal), stating that "the Planning Board of the Town of West Boylston exceeded its authority in disapproving the definitive plan as it relates to the proposed intersection." From this evidence, the jury could find that the defendants' conduct was in violation of G. L. c. 41, § 81M. See note 14, *supra*. Compare *K. Hovnanian at Taunton, Inc.* v. *Taunton*, 37 Mass. App. Ct. 639, 646-647 & n.12 (1994) (no statutory right to tie in to sewer line, and, consequently, no interference with constitutionally protected property rights and no violation of the Act). With respect to the first and second of the requirements set out above, there was an adequate basis for the jury's verdict on the State civil rights claim, distinct from the alleged violation of the plaintiff's Federal substantive due process rights. We turn, therefore, to the question whether the board's actions were "coercive" within the meaning of the Act (there being no evidence of threats or

intimidation). See *Pheasant Ridge Assocs. Ltd. Partnership v. Burlington*, 399 Mass. 771, 781 (1987).[17]

"Coercion" is defined as "the use of physical or moral force to compel [another] to act or assent." Webster's New Third Int'l Dictionary 439 (1981). It has been said that a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do. See *Longval v. Commissioner of Correction*, 404 Mass. 325, 333 (1989); *Pheasant Ridge Assocs. Ltd. Partnership v. Burlington*, *supra* at 781. Here, there was evidence that the board withheld its approval of the plaintiff's definitive plan in an effort to obtain a redesign of the intersection, although it could not lawfully do so.

We have recognized that by the Civil Rights Act, "the Legislature did not intend to create 'a vast constitutional [and statutory] tort,'" *Bally v. Northeastern Univ.*, *supra* at 718, quoting *Bell v. Mazza*, 394 Mass. 176, 182 (1985), and that the insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to

---

[17]"Coercion" was defined for the jury as "the active domination of another's will." On the basis of the opinion in *Smith v. Longmeadow*, 29 Mass. App. Ct. 599, 603 (1990), the jury were further instructed that "adverse administrative action by some agency, such as a Planning Board, unless it is part of a scheme of harassment, does not amount to threats, intimidation or coercion and does not violate [the Act]." The judge explained that to harass someone was to "trouble[,] to worry or to torment someone, or to weary them, or to fatigue them to excess."

The plaintiff argues that because there was no objection to these instructions, they became the law of the case. We disagree. The defendants moved for a directed verdict on the claim under the Act on the basis that there was insufficient evidence, as matter of law, to satisfy the statutory requirement of threats, intimidation, or coercion. Although the written motion makes a rather bald assertion in this respect, the defendants' attorney thoroughly developed the position, in arguing that motion before the judge, that before a "scheme of harassment" could be found, there must be some evidence of animus against the plaintiff or his project, and an attempt to thwart the project, through adverse administrative action, unrelated to legitimate concerns of the board. The defendants were not required to object to the jury instructions to preserve this position for consideration on appeal. See *Brighetti v. Consolidated Rail Corp.*, 20 Mass. App. Ct. 192, 196 n.4 (1985), citing Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974).

limit liability under the Act. *Bally* v. *Northeastern Univ.*, *supra.* We doubt the Legislature contemplated that every legal error committed by a local planning board, having the intended effect of requiring a landowner to alter in some way his proposed use of his property, should necessarily give rise to liability under the Act. See *Silvia* v. *Building Inspector of W. Bridgewater*, 35 Mass. App. Ct. 451, 454-455 (1993) (reversing judgment for plaintiffs on claims brought under the Act because town, the losing party, had sought only to vindicate rights which it reasonably thought it possessed). Cf. *Young* v. *Planning Bd. of Chilmark*, 402 Mass. 841, 847 (1988) (denying costs to prevailing plaintiffs where planning board "acted neither in bad faith nor with gross negligence"). A local planning board, whose functions are in many respects discretionary and which involve the interpretation and application of highly technical laws and regulations, should be allowed to address matters within its realm of responsibility without exposure to liability under the Act every time its actions are overturned.

There was no evidence that the board attempted to exercise coercion against the plaintiff to force him to forgo development of his property. The board erroneously sought a concession (the improvement of the intersection) legitimately related to one of the purposes of the subdivision control law.[18] We conclude that the evidence does not support the imposition of liability under the Act, and that judgment n.o.v. should have entered for the defendants on these claims.

4. In view of our disposition of these issues, we need not reach questions related to qualified immunity raised by the defendants.

---

[18]We assume without deciding that certain forms of oppression or domination not involving physical force might constitute coercion under the Act, and we conclude that the defendants' efforts in this case to impose an unwarranted condition related to concerns about safety did not interfere with the plaintiffs' rights in the land by coercion. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 781 n.11 (1987). Compare *United States* v. *Beaty*, 288 F.2d 653, 654-658 (6th Cir. 1961)(injunction entered to prohibit the use of economic pressure for purpose of coercing black residents to forgo the exercise of the right to vote).

5. The judgments are reversed. Judgments are to enter for the defendants.

*So ordered.*