Fecteau, J.
This matter involves a claim by a real estate developer against a municipality and certain elected and appointed officials thereof alleging that they unlawfully interfered with its right to construct a residential subdivision, with the complaint including counts alleging violations of the state civil rights act, a civil conspiracy and selective enforcement. The plaintiff contends that, upon its 1995 acquisition of the land from another entity that had previously obtained definitive approval from the local planning board to construct a subdivision containing 139 lots (approximately 30 of which had been built by the plaintiffs predecessor-in-interest), there were no further processes, applications or permits necessary to be obtained concerning wetlands protection, other than the need to obtain extensions to a superceding order of conditions that its predecessor had also originally acquired from the Department of Environmental Protection, with the exception of environmentally-related regulations and covenants to which the subdivision approval was made subject. The plaintiff further complains that, through various means, the defendants prevented it from commencing construction until it sought approval under a wetlands ordinance that had been enacted by the City of Worcester following subdivision approval; although the ordinance had been originally enacted with a grandfather provision, the city and other defendants contend that a subsequent re-codification that deleted the “projects-in-progress” exemption that the original ordinance had contained results in applicability to this plaintiff.
The plaintiffs complaint is in three counts: the first seeks a reinstatement, by declaratory judgment, of its prior exempt status under the efiy ordinance, the second alleges violations of the state civil rights act by two defendants and the third contends that all defendants were engaged in a civil conspiracy to unlawfully deprive it of its property rights. The efiy contends that the wetlands ordinance, as amended by the 1996 re-codification applies to this plaintiff and the defendants deny that any actions were taken in violation of the plaintiffs civil rights or in unlawful combination to deprive the plaintiff of its development rights.
Trial was held before me, sitting without jury, on March 13, 15, 18, 20, 22, 27, 28, April 1 and 3, 2002; the defendants argued motions for involuntary dismissal on the latter date and which were taken under advisement at that time, given the volume of documentary evidence.[1] The parties were granted leave until April 26, 2002, by which to file requests for findings of fact and rulings of law, and their final arguments were heard at that time.[2] Upon consideration of the evidence, the following findings of fact and rulings of law are made.
FINDINGS OF FACT
1. The plaintiff Indian Hill Associates, Inc. (“IHA”) is general partner in Indian Hill Associates, a limited partnership. Michael Kent (“Kent”) is the president and treasurer of IHA, David Mathias (“Mathias”) is the chief financial and operational officer of IHA and both are experienced subdivision developers.
2. The defendant city of Worcester (“Worcester”) is a municipal corporation organized under a home rule charter. At all times relevant hereto, the following individually-named defendants held the following appointed offices of the City of Worcester: Thomas R. Hoover (“Hoover”), city manager, Robert L. Moylan, Jr. (“Moylan"), commissioner of public works and Stephen F. O’Neil, Jr. (“O’Neil”), director of the office of planning and community development. Also at all relevant times, the defendant Raymond V. Mariano (“Mariano") held the elected offices of mayor and city councilor-at-large of the city of Worcester.
3. On January 15, 1986, the Worcester planning board granted to Indian Hills Realty Trust, the plaintiffs predecessor-in-interest, a definitive approval for a 139-lot subdivision located at Indian Hill Road and Ararat Street in Worcester, Massachusetts. (Ex. 51.)
4. Approval was conditioned upon a covenant of conditions between the builder and the planning board concerning the installation of water, sewer and surface systems, and appurtenances on public and private ways: Indian Hill Road, Ararat Street, Marconi Road and Westinghouse Parkway. As to Westinghouse Parkway, the agreement provided for “reconstruction and repaving of the roadway.” The agreement was approved “as to legal form” by David M. Moore (“Moore"), then an assistant city solicitor. (Ex. 26, 27.)
5. On August 26, 1988, the original subdivision received a superseding order of conditions from the Department of Environmental Quality Engineering *591 under the state wetlands act, M.G.L.c. 131, §40. It was, thereafter, extended by the Department of Environmental Protection (“DEP”) on August 26, 1992, effective to August 26, 1995, and on August 4, 1995, effective to August 26, 1998. (Exs. 4-7, 56.)
6. The original developer constructed only “Phase I” of the subdivision, which consisted of approximately 30 houses on the southerly portion of the subdivision. Access to this portion was provided by Indian HiU Parkway and New Bond Street, two existing public ways. The only subdivision roads constructed as part of this portion of the subdivision were Arapaho Road and portions of Mohave Road and Cheyenne Road. The location of the roads planned for the remainder of the subdivision were “rough cut" into the land during the original construction. In addition, Phase I construction included a detention pond, sufficient to mitigate drainage for the entire build-out of the subdivision. The construction of Phase II, as approved in 1986, would involve extending the roadways of Phase I and improving Marconi Road and Westinghouse Parkway, private ways that traversed from Ararat Street, an existing public way, through Norton Village, a thickly developed area dating from the 1930s. Phase I is located south of Phase II; Norton Village is located north of Phase II.
7. Sometime after 1988, the original developer went bankrupt and abandoned work in the subdivision. After that bankruptcy, residents who had acquired lots and houses in the constructed part of the subdivision experienced problems with water runoff, erosion and basement flooding. The evidence did not reveal, however, that any complaints were made to any city official by any nearby residents until the neighborhood began to react to observation of “due diligence” investigations and construction preparations by this plaintiff in 1995.
8. On May 8, 1990, Worcester adopted a wetlands ordinance, which became Chapter 18 of the 1986 Revised Ordinances, which regulated construction in or near wetland resources or within one hundred feet of a catch basin that was connected to wetland resource areas. Section 18 of this original wetlands ordinance exempted “projects-in-progress” for projects that had received a determination or permit under the state wetlands act, M.G.L.c. 131, §40, as of the effective date of the ordinance: “[a]ny person who applies for or receives a determination or permit under G.L.c. 131, §40 for any given project, prior to the effective date of this ordinance, shall be exempt from the provisions of this ordinance until the project is changed, modified or the permit expires.” (Ex. 9.)
9. During the spring of 1995, Moore, who had since become city solicitor, was in the process of preparing a re-codification of the Revised Ordinances of 1986, and which was to include a reorganization of the departments and agencies of the city. (Ex. 23.) In a May 4, 1995 letter from Moore to Hoover, Moore advised that the purpose of the re-codification was to re-number sections and include all amendments passed during the previous ten years, since the publication of the Revised Ordinances of 1986. Moore explicitly stated that:
[o]ther than the reformatting of the organizational and regulatory ordinances . . . there has been no general attempt to review the content of the ordinances in an effort to make substantive changes in any particular provision. These changes would be legislative policy-making in nature and it would be inappropriate if made by a scrivener in the context of an ordinance re-codification.
In this transmittal letter, Moore advised Hoover “to execute the attached executive order and forward it with the attached ordinance amendment to the city council with your recommendation for adoption.” (Ex. 23.)
10. Hoover expected Moore to inform him of any impact of substance that the re-codification may have; he did not request any department heads to review the proposed re-codified ordinances before he transmitted such to the City Council.
11. On May 9, 1995, Hoover transmitted to the City Council his recommendation that the Council repeal, in its entirely, the Revised Ordinances of 1986 and adopt the Revised Ordinances of 1995. (Ex. 23.) In this transmittal to the City Council, Hoover included the May 4, 1995 letter from Moore together with a large binder containing approximately 550 pages of text and appendices representing the entire text of the proposed revised edition of the city ordinances, as well as a “summary of the changes” to the regulatory ordinances and ordinances establishing city offices, which was attached to the May 4, 1995 letter from Moore. This summary stated that the wetlands protection ordinance “is an unchanged version of the 1986 chapter 17 .. .” (Ex. 23.) The text of the ordinances recommended for adoption by Hoover on May 9, 1995, did not contain, however, the “projects-in-progress” exemption. The re-codified ordinances ultimately adopted by Worcester on January 23, 1996 did not contain any exemption for “projects in progress.” Indeed, such re-codification without the “project-in-progress” exemption was a changed version and which represented a change of some significance.
12. On May 9, 1995, the City Council referred the proposed repeal/re-codification ordinance and reorganization plan to the Municipal Operations Committee for a recommendation. On July 31, 1995, without a public hearing, the Municipal Operations Committee voted to recommit the proposed ordinance and organization plan to Hoover. In turn, the City Council re-committed the recodification/reorganization plan to Hoover for the purpose of allowing Hoover to resubmit it to the City Council. (Ex. 71A.)
*592 13. At a point in late 1994 or early 1995, the principals of IHA, then actively involved in the construction of Arborwood, an approved subdivision in another part of the city of Worcester,[3] became aware of the availability of a sizeable and develop-able parcel of land in the city, namely, the locus in question at Indian Hill. During the spring and summer of 1995, IHA engaged an attorney, Jonathan Finkelstein, to investigate the status of the required permits on the subdivision. Attorney Finkelstein had extensive experience in land use and real estate development, and had worked previously as an attorney on the staff of the city solicitor for the City of Worcester with a concentration in land use matters, including planning, zoning, and wetlands protection. (Ex. 1.) In concert with the due diligence investigation by Finkelstein, which included correspondence with several city officials involved in planning, zoning, environment and public works, engineers and surveyors assessed the property for IHA. This assessment included preliminary surveying and involved going upon the property.
14. Sometime in the fall of 1995, Hoover, who owned and resided at 4 Arapaho Rd, (lot 8 in Phase I of the original subdivision), and an abutter to Phase EL, observed surveyors on the subdivision property and his neighbors, informing him of other recent appearances of people on the property, asked him if he knew what was going on. As a result of these observations, Hoover asked O’Neil to give him a report as to the recent activity.
15. On September 5, 1995, Hoover re-transmitted the repeal/re-codification ordinance to the City Council, stating that:
[t]his recommittal-resubmission will have the effect of re-setting the ninety day period for reorganization plans under the city charter. This transmittal includes the same documents as were originally submitted except that the large binder containing the text of the proposed recodified ordinances and executive orders is omitted for convenience and is incorporated only by this reference.
In addition to omitting the text of the proposed re-codified ordinances, Hoover did not transmit the reorganization plan. (Ex. 25.)
16. Based on and relying upon the legal and engineering investigations that it had commissioned, IHA decided to purchase the tract. Michael Kent, the president and treasurer of IHA and an experienced real estate developer, testified that he and his associates never closed on a land purchase intended for development prior to ensuring that all necessary local approvals, apart from actual construction permits, had been obtained. It applied for and obtained financing, in the fall of 1995, to purchase Phase EL The Phase II property was conveyed by quitclaim deed, dated October 6, 1995, recorded October 11, 1995, to IHAfor $475,000. (Ex. 17.)
17. On October 6, 1995, O’Neil provided Hoover with copies of: (a) the 1986 agreement between the previous developers and the City regarding Westinghouse Parkway, which had been reviewed and signed by Moore in his capacity as an assistant city solicitor; (b) the 1986 Planning Board approval decision for the subdivision; and (c) a January 13, 1986 letter from the Law Department to the Director of the Worcester Bureau of Land Use Control confirming the developer’s rights with respect to the proposed reconstruction of Westinghouse Parkway. The October 6, 1995 memorandum from O’Neil advised Hoover that IHA intended to purchase the subdivision and finish the building of the subdivision (“Phase II”). (Ex. 26.) After receiving O’Neil’s report, Hoover asked the city solicitor, David M. Moore (“Moore”), as to the application of the state conflict of interest law to him with regards to the subdivision. Moore told Hoover that, as an abutter to the subdivision, Hoover was prohibited from participating as city manager in any aspect of the subdivision. The evidence did not indicate whether “participation” was further defined for him at that time.
18. On October 24, 1995, Hoover transmitted the reorganization plan to the City Council, which had been omitted from the September re-submittal. That same day, the City Council referred the reorganization plan to the Municipal Operations Committee. (Ex. 72.) Also on this same date, Hoover transmitted to the City Council the memorandum on the status of Indian Hill he received from O’Neil on October 6, 1995, with attachments (Ex. 27), as well as his own observations of activities on the parcel and the concerns voiced to him from his neighbors.
19. Without public hearing, on December 5, 1995, the Municipal Operations Committee recommended passage of the proposed repeal/re-codification ordinance and reorganization plan. That same date, the City Council voted to accept the Report of the Committee. (Ex. 7IB, D.)
20. On December 8, 1995, a notice of the proposed repeal/re-codification ordinance and reorganization plan was advertised. This publication did not include the full text of the proposed ordinances. The publication only gave notice that:
under the provisions of Massachusetts General Laws, the City Council voted to waive the advertising of the recodification and reorganization plan in that it exceeds in length eight octavo pages of ordinary book print. You are further notified that the entire text of said proposed recodified ordinances and reorganization plan may be examined at the Office of the City Clerk.
(Ex. 64.)
21. On January 23, 1996, the City Council voted to repeal the Revised Ordinances of 1986 and to re-codiiy the Revised Ordinances and the reorganization plan. (Ex. 61.)
*593 22. On January 31, 1996, a notice of the ordination of the Revised Ordinances of 1996 was published, again without the text of the re-codified ordinances. The January publication was identical, except for the introductory language, to the publication of December 8, 1995, again stating that the full text of the re-codified ordinances was available for examination at the Office of the City Clerk. (Ex. 64.)
23. The 1996 Revised Ordinances of Worcester included the repeal/re-codification ordinance and a preface with a statement of the intent of the City Council in taking such action. The repeal/re-codification ordinance stated, at Section three, that “(t]he repeal of all ordinances as accomplished by Section two hereof shall not apply to: ... (c) any ordinance, order or resolution granting any right, privilege or franchise to any person . . .” The preface to the 1996 Revised Ordinances was signed by Moore and was identical to Moore’s letter of May 4,1995, that was part of the re-codification transmittal to the City Council. This letter was before the City Council during its deliberations and vote on the repeal/re-codification ordinance, having been transmitted to the Council by Hoover. (Ex. 61.)
24. At various times during June 1996, potential contractors, intending to submit bids to IHA and visiting the site, caused neighbors of the subdivision, particularly those living on Westinghouse Parkway, to contact Mariano, the mayor’s office and the department of public works to get information about the project and to express their concerns about it. The concerns expressed by the neighbors focused on increased traffic expected from construction vehicles and the new residents, the possibility of damage to wetlands on the site, the effect of the development on erosion problems that had been experienced as a result of the initial phase and the possibility of damage to wildlife on the site.
25. The subdivision as approved required access to the subdivision. The construction of the subdivision by IHA would involve extending the initial roadways of Phase I of the subdivision through Phase II to an area known as “Norton Village,” an area of houses constructed many decades ago for employees of the nearby Norton Company. It is located north of the subdivision and consists of the following private streets: Westinghouse Parkway, Marconi Road, Delaval Street, Heroult Street and Watt Road. Westinghouse Parkway is a “boulevard” type street in that it is divided with a wide vegetated median. It is the primary street leading from Ararat Street, a main public street, to the entrance to the subdivision.
26. The initial portion of the subdivision constructed in the 1980s (Phase I) did not involve Westinghouse Parkway. Construction of the remainder of the subdivision would require water and sewer lines to be extended from the subdivision through Westinghouse Parkway to Ararat Street. Once Phase II of the subdivision was constructed, Westinghouse Parkway would provide the primary access route from Ararat Street to the houses in this section of the subdivision.
27. Now aware of neighborhood concerns, Mariano agreed to conduct a “mayor’s walk”[4] at the subdivision site on June 17th, to meet with a small, select group of residents at one neighbor’s house and later, in the evening, to meet with a larger group of residents at the Nelson Place School. Mariano invited the district city councilor for that area, Stephen F. Patton (“Patton”), to attend as well.
28. Mariano directed his staff assistant, Robert F. Pezzella (“Pezzella”) to arrange the meeting. Pezzella contacted Marianne E. Grenon, his counterpart in the city manager’s office, informed her of the planned mayor’s walk and asked that the city manager send appropriate city officials. On June 12, 1996, Grenon faxed a memo to Joseph G. McCarthy, deputy commissioner of the city department of health & code enforcement, Moylan and O’Neil, asking them to attend the June 17, 1996 mayor’s walk. Grenon was authorized to and signed the memo with the name of “Thomas R. Hoover,” a customary practice. Hoover’s memorandum identified the issues as “traffic problems, runoff problems of underground springs, historical district, wildlife, and water tanks.”[5] (Ex. 31.) This memorandum also stated that Hoover “will not be in attendance because as you know, he lives at 4 Arapaho Rd.”
29. IHA was not notified of the mayor’s walk or of the other neighborhood meetings scheduled for June 17th and, consequently, no one representing its interest was present at any of the gatherings that day.
30. On or about June 12, 1996, Moylan directed Edward Carrigan, Principal Engineer for the Department of Public Works (“Carrigan”), to provide him with certain information about the subdivision. On June 13, 1996, in a memorandum to Moylan, Carrigan stated that the development section of the D.P.W. was not aware of any documented current complaints on Phase I and that the subdivision had been approved by the Planning Board in January 1986. He summarized the development and ownership history of the property, and stated that the D.P.W.:
has been informed by the Law Department that under the State Subdivision Control Law the Planning Board Approval is indefinite and transferable to new ownership. The Law Department also states that in its opinion, the developer has the right to improve the private streets as proposed.
(Ex. 40.)
31. Patton, Moylan, O’Neil, Mariano, and Pezzella were in attendance at the neighborhood meeting at which approximately 80 residents of the neighborhood were present. The residents in attendance were mainly concerned about the increased traffic that would be generated by the Phase II development over the primaiy access, Westinghouse Parkway, and the possi *594 bility of an alternative route for both construction vehicles and those generated by the prospective residents. In addition, the residents voiced concerns over the development of this property, including possible erosion problems, and other environmental issues, including the possible impact on wetlands and wildlife. It is also likely that some of the residents wanted to preserve the undeveloped nature of the area, which for many years allowed them the amenity of nearby green space.
32. Sometime after this June 17, 1996 meeting, Mariano received an undated letter from the neighborhood group, which stated:
In regards to our neighborhood meeting on Mon. June 17 we have met and decided unanimously to fight the building of the housing development [sic] at all costs. We understand that we may have environmental issues and also legal issues which may help us to do this. At this time we feel that there no are [sic] concessions that would be appropriate, due to the fact that none of us want the project to go forth. At this meeting we selected 4 spokespersons: [names omitted). In closing I would like to thank you in advance for your support and help with this matter.
(Ex. 54.)
33. At a city council meeting held on June 18, 1996, and as a result of an issue that arose during the mayor’s walk, the city council adopted an order requesting a report from the city solicitor regarding the legal obligations concerning notice to abutters of the approval of a subdivision, specifically calling for “a thorough review of the public hearing notification process to confirm if the abutters of the Indian Hill Village development (1986) were properly notified of the then proposed development.” (Ex. 67.)[6]
34. Contemporaneously with a request by Moylan upon his staff to review the subdivision and to explore alternative points of access, Attorney Finkelstein, in a June 26, 1996 letter to Mariano, expressed the desire and willingness of IHA to meet with city officials and neighbors to discuss any issues relating to the subdivision. (Ex. 10.)
35. On July 2, 1996, city officials met with representatives of IHA at the D.P.W. offices. Present were Moylan, O’Neil, Pezzella, Carrigan, D.P.W. Civil Engineer Moosey, and D.P.W. employees Michael Caforio and Richard Bradshaw. In addition, Deputy City Solicitor Michael Traynor, from the Law Department, and Building Commissioner David Holden were present. Present at this meeting representing IHA were Michael Kent, President and Treasurer of IHA, David Mathias, Chief Financial and Operational Officer of IHA, and Attorney Finkelstein. Mathias testified that he asked Finkelstein to attend only because he was told that Pezzella and Traynor would be at the meeting.
36. At this July 2nd meeting, city officials, led by Moylan, expressed the concerns of the neighborhood to IHA. Moylan asked IHA to consider one of the concerns of the neighborhood by the creation of possible alternate means of access to the subdivision, such as to change the construction entrance to minimize the use of Westinghouse Parkway during construction. Either O’Neil or Pezzella suggested the possibility of using Sala Street[7] as the primary access way into the completed subdivision. IHA objected to any changes in the access route, as it would likely necessitate a “re-engineering" of its plans, possible modification of its approval by the planning board as well as possible wetlands issues that would require submission to the Conservation Commission. Such changes might also have caused it a loss of the protection of the “project-in-progress” exemption in the 1990 wetlands ordinance. IHA further indicated that its budget did not allow for such a substantial change and its attendant costs as its financing was dependent on the plan as approved and was in place.
37. Also at the July 2, 1996 meeting, O’Neil expressed his concern about the marketability of the housing proposed by IHA and raised the possibility of reducing the number of house lots which would ease the impact of the subdivision upon the existing home of Norton Village, and preserve a portion of the subdivision as open space. Either together with the proposal to consider an alternative to Westinghouse Parkway as access or separately, IHA stated that a reduction in the number of houselots was not financially feasible, since infrastructure cost would remain constant and since their financing was dependent upon the number of houselots as originally planned.
38. O’Neil stated that he thought the subdivision might be subject to the city wetlands ordinance. IHA attorney Finkelstein produced a copy of the city wetlands ordinance and said that the subdivision was exempt under the “projects-in-progress” exemption. No one at the meeting, O’Neil and Traynor included, informed IHA that the “projects in progress” exemption had been removed from the ordinances in the re-codification enacted on January 23, 1996, or contested the position as expressed by Attorney Finkelstein. I infer that no one at that meeting was then aware of the exemption having been deleted from the ordinance as a result of the re-codification.
39. At this meeting, the IHA representatives stated that they would attempt to mitigate the traffic concerns anticipated by the neighborhood and discussed the possibility of using breakaway barriers and plantings on Westinghouse Parkway to restrict access to all but emergency vehicles. When this suggestion appeared to be inadequate or unacceptable to the city officials, IHA discussed the use of cul-de-sac roadways where Phase I and II connect, in addition to those already approved, to further limit through-traffic between the two subdivision phases.
*595 40. David Mathias testified that the July 2, 1996 meeting lasted about one hour, was very “confrontational" with the city officials appearing to impose a burden on IHA, without concession, to address all the demands of the residents of the neighborhood. Contrasting the advantage of budding rapport with the neighborhood to the disadvantage of legal challenges brought by the neighborhood, Moylan told IHA that it could “spend money in a positive way or a negative way,” obviously implying that the developer could be pro-active in attempting to satisfy neighborhood concerns or, by the potential cost of inflexibility, including the possibility of litigation, each having fináncial exposure. I find that this discussion was not intended to be either threatening or coercive, but was rather merely an expression of the obvious fiscal reality to a developer encountering a “not in my back yard” stance of a neighborhood in opposition to a proposed development.
41. Nonetheless, Mathias and Kent felt threatened by Moylan, who chaired the meeting. They interpreted Moylan’s statements as a threat that the subdivision would be stopped by the city if IHA did not agree to take steps to address the neighborhood demands by way of reducing the scope of the project and/or providing alternate means of access to the subdivision. I find that, although the city officials at this meeting were aggressive in their desire to persuade the developer to work with the abutters to satisfy their concerns, the officials present did not threaten the developer with a blockage of the development if neighborhood concerns were not satisfied; these officials were, at that time, unaware that the neighborhood was completely opposed to the construction of the subdivision in any form and that there were likely no alternatives that would satisfy the neighborhood to the point that their opposition would be withdrawn. I also find that as a result of the meetings of June 17th and July 2nd, the city officials present intended to scrutinize this subdivision to make sure that there was compliance with eveiy statute, ordinance and regulation and that they were indifferent to the financial impact upon the developer that any changes made to the plan would have. However, I find that there was no one associated with the DPW who was knowledgeable about the status of the deleted grandfather provision of the wetlands ordinance or who knew or had reason to know at that time of any other means to obstruct or delay construction.
42. At the July 2, 1996 meeting, the IHA representatives were told for the first time that there was going to be a neighborhood meeting with city officials that night. Moylan, O’Neil and other city officials attended this meeting, as did Attorney Flnkelstein on behalf of the developer; he was not asked any questions. The application of the wetlands ordinance was raised at this meeting but O’Neil stated that it did not apply due to the grandfather provision.
43. In a memorandum dated July 11, 1996, D.P.W. Civil Engineer Moosey, at the request of Moylan, directed the heads of the D.P.W. traffic, water, and engineering divisions to review Phase II under current development construction regulations, not the 1986 ordinances and regulations in effect when the subdivision was approved. This was done to determine what differences, if any, existed between the construction regulations in effect in 1986 and 1996. By July 31, 1996, each division head had submitted its review of Phase II under the 1996 Revised Ordinances, as amended, and construction regulations which were then in effect. (Ex. 43.) At or about the same time, Moylan also requested that an outside engineering firm conduct a review of Phase II under current laws. The engineering firm submitted its report, dated July 30, 1996. (Ex. 47.) There is no evidence that Moylan or any other official of the DPW intended to impose 1996 construction regulations upon the plaintiff. I find Moylan’s testimony on his reason for ordering the comparison to be credible, namely, since the city would ultimately own the infrastructure, given the ten-year hiatus, he wanted to be prepared to confront construction design and/or materials different from and possibly inferior to those to which they were then accustomed.
44. On July 15, 1996, IHA, through Mathias, sent a letter to Moosey which included IHA’s plan for phasing the construction to meet market demand and IHA’s plan for the routes of construction vehicles. (Ex. 22.) The letter indicated that IHA planned to begin site construction (infrastructure) “within the next two weeks” and requested that a pre-construction conference be scheduled. The letter also offered to consider changing the streets in the subdivision by installing cul-de-sacs which would prevent traffic from traveling between the existing part of the subdivision (phase I) and the part to be constructed by IHA (phase II) and thus reduce traffic volume on the roads that provided access to the two development phases. This letter was forwarded by Moylan to the cify manager’s office. (Ex. 32.)
45. On July 24, 1996, Mariano held a meeting in his office to discuss the subdivision. In attendance were: Mariano, Patton, subdivision abutters and two neighborhood representatives (including one who had hosted the smaller meeting of June 17th at his home), Moylan, O’Neil, the deputy commissioner of public health and code enforcement Joseph G. McCarthy, the director of code enforcement David Holden, and Moore. The city officials who attended the meeting in the mayor’s office did so under a standing order given by Hoover to his assistant, Marianne E. Grenon, to allow the appropriate department heads to attend meetings with the mayor without Hoover present, due to his inability to participate with respect to this subdivision due to a conflict of interest.[8] Councilor Patton testified credibly that Hoover was physically *596 present for at least some part of the meeting but did not actively participate.
46. Mariano conducted the meeting, which lasted about one hour. The discussion centered on the status of the development and anticipated traffic problems during and after construction, but included other issues as well, such as erosion control. The discussion also included the issue of whether there was any lawful way of stopping the subdivision from proceeding. By this point in time, Moylan was satisfied, based upon the review by his staff, that it was a fully approved subdivision and that, other than issues concerning the posting of the performance bond and the payment of fees for inspections, there was nothing that could be done to stop the project and had so informed the mayor. Mariano still had questions, many of which had been raised by the neighborhood residents at the meetings, and wanted answers to those questions. I infer, and thus find that Mariano was not satisfied with the information that he was receiving and was still interested in not only ensuring that all applicable laws were followed but also in seeking a way to satisfy the neighborhood demand to stop the project if it could be done lawfully. His tone intimated that the department heads present were to continue to stay on top of compliance issues and to search for ways to satisfy the neighborhood opposition.[9] Hoover’s status as an abutter to this subdivision, and his being conflicted into non-participation, without naming a special assistant or deputy for supervision of municipal officials and employees as regards this subdivision, created a vacuum or blurring of the customaiy municipal command structure; this vacuum allowed a perception to exist that city officials normally under his command may report directly to the mayor. I find that the officials present at the meeting in the mayor’s office were aware of the charter’s restrictions on Mariano.
47. On July 29, 1996, Mariano notified the City Clerk that he was calling a special meeting of the City Council to discuss concerns raised by residents of the Indian Hill neighborhood and to consider possible actions the council could take. (Ex. 34.)
48. On July 30, 1996, the preconstruction conference requested by IHA was held at the D.P.W. offices. In attendance were David Mathias, D.P.W. Civil Engineer Moosey (“Moosey”), and other employees of the D.P.W. (Ex. 48.) At this meeting, Moosey discussed with Mathias the posting of a performance bond, the paying of inspection fees in advance, the installing of erosion controls, providing a construction schedule for the subdivision, and providing the subdivision construction completion date. Moosey used a preconstruction checklist, his standard practice. This checklist did not require a performance bond, other than inquiring whether a bond or covenant had been required by the Planning Board, did not require the payment of inspection fees in advance (although the DPW was going to require it) and did not require the installation of all erosion controls. The checklist required all work to be performed to the schedule of construction approved by the D.P.W. (Ex. 48.)
49. Also on July 30th, Hoover informed Mariano that he had been advised by Moore that:
he was prevented by the Conflict of Interest Law from participating as City Manager in any fashion on the subject matter of the special meeting of the City Council called for tomorrow at 5:00 p.m. The Solicitor advises me that I may not even be present in the Council Chambers while this subject is discussed.
A copy of this letter was sent to all members of the City Council and the City Clerk. (Ex. 35.)
50. On July 31, 1996, the City Council held the special meeting called by Mayor Mariano. The only item on the agenda was the Indian Hill Village subdivision, Phase n. At this special meeting, the City Clerk presented to the Council a letter, dated July 31, 1996, from Moore. In this letter, Moore stated that the projects-in-progress exemption of the wetlands protection ordinance was not part of the 1996 Revised Ordinances and declared that the wetlands protection ordinance applied to Phase II of the IHA subdivision. (Ex. 55.) This July 31, 1996 opinion differed from Moore’s May 4, 1995 advisory letter to Hoover, in which he stated that: ”... there has been no general attempt to review the content of the ordinances in an effort to make substantive changes in any particular provision...” (Ex. 23), and differed from the summary of the proposed recodified ordinances provided by Moore as part of the September 5, 1995 transmittal package to the City Council. That summary stated that there were no changes to the 1990 wetlands ordinance.
51. In addition, the City Council considered a prepared ordinance adding requirements to Chapter 12 of the 1996 Revised City Ordinances, Section 12, “Permit for the Construction of Ways,” voted to ask the DEP to determine whether work proposed at the Indian Hill subdivision violated the Massachusetts Environmental Protection Act (G.L.c. 30, §§62 et seq.) or the State Wetlands Protection Act (G.L.c. 131, §40), and voted to request the Law Department to “research a way to stop the developer at Indian Hill from accessing any private streets, including New Bond St. and Westinghouse Parkway.” [Emphasis in original.) (Ex. 68.)
52. On August 5, 1996, IHA requested inspection permits for the infrastructure work on several public and private ways, such work having been approved by the Planning Board in 1986. D.P.W. Engineer Moosey approved and signed the completed requests that same day. (Ex. 52.)
53. In a letter dated August 6, 1996, Attorney Finkelstein, in accordance with condition number 16 *597 of the Superseding Order of Conditions, notified the DEP and the Worcester Conservation Commission[10] that “activity regulated by the Superseding Order is to commence on the project site.” (Ex. 15.) That same day, August 6, 1996, after consulting with the law department, O’Neil sent a letter by facsimile transmission to Attorney Finkelstein, declaring that IHA “does not have the authority to commence work on the project site because the Indian Hill subdivision does not have approval under the local City of Worcester Wetland Protection Ordinance.” O’Neil stated that he was acting as “administrator on behalf of the Worcester Conservation Commission.” (Ex. 12.) He knew that he had not been authorized by the Conservation Commission to speak or act on its behalf, that he had not discussed the issuance of the letters with the commission prior to having done so, that he did not have authority to order a work stoppage on its behalf or to take any other enforcement action in the name of the commission and that he was not acting on its behalf when he sent the letters.
54. On August 7, 1996, O’Neil sent IHA attorney Finkelstein a letter that stated:
As you know you are required to file a Notice of Intent with the Conservation Commission to determine if you fall within the jurisdiction of the local wetlands ordinance as it relates to the Indian Hill subdivision. Until such time as you have filed with the Commission, and you have had a hearing before same, you should cease work at the site. If you have any questions, please fell free to contact me as soon as possible.
A copy of this letter was also delivered to the worksite by an unidentified city employee. Prior to sending this letter, O’Neil had not consulted with any member of the Conservation Commission.
55. On August 9, 1996, David Mathias delivered a check in the amount of $9,045.90 to the D.P.W. as payment of the fees for the inspection peimits approved by Moosey on August 5 and 9, 1996. (Ex. 52.) On August 9, 1996, while delivering the check for the inspection fees, Moosey stated to David Mathias that the check was probably going to be returned. In a letter dated August 9, 1996, the inspection fees check from IHA was returned to David Mathias by Moosey. This letter stated it was sent “after receiving advice from the Deputy City Solicitor.” The letter dated August 9, 1996, also declared that “until approval under local wetland ordinance has been granted, work cannot begin on the Indian Hill Subdivision property. Therefore, street work cannot begin under Chapter 12 Section of the Revised City Ordinances (1996).” (Ex. 14.) By returning the check for inspection fees, the city department of public works, through Moosey, was effectively denying IHA’s application for inspection permits.
56. The letter from the DPW dated August 9, 1996, by which the checks were returned to IHA, bore a handwritten name of D.P.W. Principal Engineer Edward Cairigan and the initials “TCR” for Timothy C. Reiner. Edward Carrigan testified that he did not write the letter, did not authorize the letter, and did not authorize anyone to initial the letter. The letter was written by Moosey and signed and initialed by another D.P.W. employee, Bob Fiore, who had no authority to sign for Carrigan, Reiner or any employee or official. Testimony from Moosey established that, although the letter was intended to be sent to IHA, Fiore signed the letter as a “joke.” (Ex. 14.) I infer that the letter was sent and the checks for the inspection fees returned at the direction of the city Law Department. Prior to authoring the letter and causing it to be mailed, Moosey had not consulted directly with Moylan, O’Neil, Hoover or Mariano.
57. On or about August 9, 1996, IHA stopped the mobilization of the materials and equipment on site in preparation for beginning infrastructure street work in response to the official letters from O’Neil ordering IHA to cease work. Other than by filing the within lawsuit, IHA took no action to specifically challenge the effective denial of its application for inspection permits, either administratively or in court, nor did it seek a determination from the Conservation Commission that the 1990 wetlands ordinance did not apply to this project. IHA accepted the letters from O’Neil at face value, considering them to be cease and desist orders. Again, only as its allegations of civil rights violations and civil conspiracy in the case at bar relate to O’Neil, IHA did not attempt to challenge, administratively or otherwise, the propriety and/or effect of the letters as stop-work orders nor the authority of O’Neil to order a work stoppage without the knowledge or consent of the Conservation Commission.
58. Beginning in the fall of 1996, IHAbegan preparing its Notice of Intent application under the 1990 wetlands ordinance, as recodified in 1996, a process that involved the preparation of technical and scientific data. In May 1997, IHA filed its Notice of Intent under the wetlands ordinance. On or about September 28, 1997, the Worcester Conservation Commission issued an Order of Conditions permitting Phase II of the subdivision to proceed under the wetlands ordinance. (Ex. 20.)
59. As a result of the stoppage of work, costs associated with compliance with the wetlands ordinance permitting process and in the delay of construction of Phase II, IHA suffered substantial costs additional to those originally contemplated by the development of this phase of the subdivision.
DISCUSSION
The plaintiff in this case seeks a judgment, in count I of its amended complaint, that declares that the 1996 re-codification of the 1986 Ordinances of the City of Worcester, as amended, was procedurally flawed, that its application by the city officials to IHA deprived the plaintiff of a vested property right in connection with *598 the definitive subdivision approval granted to its predecessor-in-interest of the locus in question, and that the 1990 version of the wetlands ordinance, together with its exemption for projects-in-progress, should be applied instead. In addition, the plaintiff seeks money damages alleged to be the result of intentional torts: violations, by two city officials in their individual capacity,[11] Robert Moylan and Stephen O’Neil, of the state civil rights act in count II, and for a civil conspiracy alleged in count III among all defendants to deprive it of the value of its property interest in the subdivision. The defendants deny that the plaintiff is entitled to relief in any form, contending that the re-codification was validly adopted, that the wetland ordinance applies substantively to this plaintiff, and that the plaintiff has failed to prove any violation of civil rights or a civil conspiracy.
I. Declaratory Relief
The plaintiff contends that the re-codification of the ordinances of the city of Worcester, by deletion of the grandfather clause of the original wetlands ordinance, does not apply to it and that it is entitled to a judgment declaring that its Indian Hill subdivision is exempt from the wetlands ordinance. Specifically, the plaintiff alleges that the re-codification was procedurally defective, in that the full text of the re-codification was not publicized before and after its enactment; in addition, IHA contends that the deletion of the grandfather clause and the consequent application of the ordinance by the city against it amounts to a retroactive and unreasonable application of the wetlands ordinance that deprived it of substantive due process regarding a vested property right that it had obtained by virtue of the approval of its definitive subdivision plan and the superceding order of conditions from the DEP. Such claims are controversies appropriate for consideration under the jurisdiction of the court for declaratory judgment: “. . . to secure determinations of right, duty, status or other legal relations under.. . a charter, . . . municipal ordinance or by-law, . . . including determination of any question of construction or validity thereof. . .” G.L.c. 231A, §2.
Turning first to the claim of the plaintiff that the re-codification of the city ordinances did not comply, procedurally, with the city charter, recourse to the language of the charter is necessary. Worcester is governed by a Home Rule Charter (“Charter”) under the provisions of Mass. Gen. Laws, c. 43B. The Charter is the “constitution” of the city, containing the basic provisions that establish the form, structure, and organization of the government and the powers and duties of the various city officials. 18 Massachusetts Practice, “Municipal Law,” §23, fourth ed.; see Mayor of Gloucester v. City Clerk of Gloucester, 327 Mass. 460 (1951). The Charter controls the process that must be followed in the codification of ordinances and adoption of any reorganization plan where such does not conflict with laws enacted by the Massachusetts Legislature. Kowalczyk v. Town of Blackstone, 48 Mass.App.Ct. 58, 59 (1999).
The Charter states, in Article Two, §2-9(c), that:
Every proposed ordinance . . . shall be published once in full in at least one local newspaper, and in any additional manner as may be provided by ordinance, at least ten days before its final passage. After final passage, the ordinance as amended and completed, shall again be published once in the aforesaid manner; provided that if any ordinance or proposed ordinance, or codification thereof, shall exceed in length eight octavo pages of ordinary book print, then there shall be no requirement to advertise as aforesaid if the same is published by the city council in a municipal bulletin or printed pamphlet, but otherwise in conformity with said provisions, except for zoning ordinances or amendments thereto, a summary of which shall be published at least two times in a local newspaper . . .
The plaintiff contends that, notwithstanding the provision in the article that publication of the full text of the recodified ordinance may be waived, due to its length, following enactment, the charter does not permit the waiver of publication upon its proposal. The plaintiffs interpretation is apparently dependent upon the fact that the waiver of full publication appears within the second sentence that begins “[a]fter final passage,” implying that the words that follow the semi-colon are a modifier of the first part of that sentence but not of the first sentence (that begins “[e]very proposed ordinance . . . shall be published”). Notwithstanding the inartful use of a semi-colon, the plaintiffs interpretation is betrayed by the precise language of the article stating that “if any ordinance or .proposed, ordinance, or codification thereof, shall exceed eight octavo pages . . .,” the alternative form of notice by the availability of a printed pamphlet may be followed, as was done here. [Underline added.] The use of these words clearly indicate the intent of the charter to allow for alternative form of availability of the full text of the re-codification upon both proposal and adoption. Publication before and after re-codification, via notice in a newspaper that a looseleaf copy of the entire text of an ordinance re-codification is available for inspection, satisfies the “printed pamphlet” charter provision, and “promotes the [obvious] legislative purpose of avoiding newspaper publication of the entire text of documents of extraordinary length” and is not inconsistent with any other law. Yetman v. City of Cambridge, 7 Mass.App.Ct. 700, 704-07 (1979). The city’s publication of a legal notice, both on December 8, 1995, regarding the proposed re-codification, and on January 31, 1996, regarding the enactment of the re-codified ordinances, wherein reference was made to the full text of the re-codified ordinances as proposed and enacted being available for inspection at the office of the City Clerk, complied with the applicable statute and charter provisions.[12]
*599 Moving, then, to the substantive issue concerning re-codification, the plaintiff complains that the deletion of the grandfathering “projects-in-progress” provision from the wetlands ordinance, and the city’s application of the ordinance against IHA amounts to an unreasonable, retroactive interference with its property rights.
In 1986, Worcester was governed by the Revised Ordinances of 1986. These ordinances did not include an ordinance regulating activities near or in wetland resource areas. In 1986, the State Wetlands Protection Act, G.L.c. 131, §40 (“Act”), authorized the Worcester Conservation Commission to regulate activities near or in wetland resource areas. Under the Act, an order or determination of a local conservation commission could be appealed to the Massachusetts Department of Environmental Protection (“DEP”) for a superseding order or determination. In point of fact, the plaintiffs predecessor-in-interest had successfully appealed to the DEP for a superceding order of conditions from that given by the local conservation commission.
On May 8, 1990, the City Council amended the Revised Ordinances of 1986, by adding Chapter 18, a wetlands protection ordinance (“wetlands ordinance”). The wetlands ordinance gave the Worcester Conservation Commission (“Commission”) the authority to regulate construction within 100 feet of a storm drain system component that discharged into any lake, pond, river, stream, or wetland. This authority was in addition to the Commission’s jurisdictional authority under the Act to regulate activity within 100 feet of the wetland resource areas as those are defined in the Act.[13] Section 18 of the 1990 wetlands ordinance excluded projects from its provisions that had received a determination of applicability or order of conditions under the Act as of the effective date of the ordinance (“work-in-progress exclusion”).
In January 1996, the City Council repealed the 1986 Revised Ordinances and re-codified the ordinances as the 1996 Revised Ordinances. Under the Charter, the re-codification of all ordinances must be structured as both a proposed ordinance amendment and a reorganization plan. The 1996 Revised Ordinances contained no “project-in-progress” exception to the wetlands protection ordinance, per se. However, the ordinance of enactment did include a grandfather provision, of sorts, more commonly known as a “saving clause” (a clause expressly saving rights which accrued under a prior law, see McCray v. Hornblower, 298 Mass. 334, 337 (1937)). See also Dupont v. Commissioners of Essex County, 46 Mass.App.Ct. 235 (1999), in which the court stated: “(f]rom the absence of a saving clause in the 1996 act, we can infer that the Legislature ‘intended’ (if the word can fairly be used) not only to nullify c. 32, §16(2), for the future, but also to abort any lawsuit under § 16(2) commenced before, and pending on the date August 9, 1996. Indeed, that such was the legislative intent is not seriously disputed.” At p. 237. Here, the subdivision in question obtained a right under the 1990 ordinance, namely, an exemption from its application, due to having already obtained a superceding order of conditions from the DEP. This right of exemption existed, without question, from 1990 to and including the time that IHA changed its position substantially and in reliance thereon, by its purchase of the locus of this subdivision and the obtaining of financing to do so, as well as the incurrence of other expenses in order to begin preparation for construction.
In interpreting municipal ordinances, Massachusetts courts use traditional rules of statutory construction. Cohen v. Board of Water Commissioners, Fire District No. 1, South Hadley, 411 Mass. 744, 748 (1992); Bell v. Treasurer of Cambridge, 310 Mass. 484, 489 (1941). Courts begin any ordinance construction analysis with the general rule that:
... a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished . . .
Danusis v. Longo, 48 Mass.App.Ct. 254 (1999); Petrucci v. Board of Appeals of Westwood, 45 Mass.App.Ct. 818, 822 fn.7 (1998).
Massachusetts has long adhered to the rule that legislation looks to the future and not to the past, in the absence of language directing otherwise, and, with the exception of statutes relating to remedies, does not affect substantive rights. Campbell v. Boston, 290 Mass. 427, 429 (1935); Sentry Fed. Savings Bank v. Co-Operative Cent. Bank, 406 Mass. 412, 414 (1990) (“unless the legislative intent is unequivocally clear to the contrary, a statute operates prospectively, not retroactively"); Price v. Railway Express Agency, Inc., 322 Mass. 476, 483 (1948); Hanscom v. Malden & Melrose Gas Light Co., 220 Mass. 1 (1914). See also Figueroa v. Director of Department of Labor and Workforce Development, 54 Mass.App.Ct. 64, 70-71 (2002). A permit that has been exercised confers a vested property right immune from governmental action prospectively effective. Davis v. Zoning Board of Chatham, 52 Mass.App.Ct. 349, 360, fn.15 (2001). The repeal of an ordinance cannot act to deprive a person of vested economic rights or impair contractual obligations. 6 McQuillan, Municipal Corporations, §§21.15 and 21.45 [3d ed. 1969], cited in Yetman v. Cambridge, 7 Mass.App.Ct. 700, 704 (1979).[14]
In Murphy v. Planning Board of Norwell, 5 Mass.App.Ct. 393 (1977), the court was asked to consider the lawfulness of a planning board’s rescission, pursuant to a 1973 amendment to G.L.c. 41, §81W, of a definitive subdivision approval granted in 1968; in particular, the 1973 amendment eliminated the prohibition against the rescission of planning *600 board approval without the consent of the developer and mortgagee. There, the court held that such a rescission amounted to an unlawful retroactive application:
The general rule of interpretation is that all statutes are prospective in their operation, unless an intention that they shall be retrospective appears by necessary implication from their words, context or objects when considered in the light of the subject matter, the pre-existing state of the law and the effect upon existent rights, remedies and obligations . . . It is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retroactively, and as applying to pending actions or causes of actions . . .
The question then becomes whether the amendment of §81W relates to remedies or to the substantive rights of a single grantee or a mortgagee of the entire parcel. Here, the plaintiff acquired the land which was subject to an approved plan of subdivision and the mortgagee made a loan secured by a mortgage on that land at a time when the approval of the subdivision plan could not have been revoked without the assent of both. It seems to us that land approved for a subdivision would have a value greater than that which it would have without such approval. Whatever that increase in value may be, it is one of substance.
Having concluded that substantive rights of the plaintiff are affected by the amended §81W, we look to see whether the Legislature intended a retroactive effect in “unequivocal terms” or “by necessary implication.” In the absence of veiy clear statutory language, we do not apply legislation retroactively so as to affect substantive rights.
Murphy, at 396. [Internal citations omitted.)
Indeed, the city council, at the time of its approval of the re-codification, recognized the need for and demonstrated an interest in the protection of substantive property interests from unreasonable, retroactive application of the revised ordinances: the 1996 ordinance that repealed the 1986 Revised Ordinances stated, at Section three, in the nature of a “saving clause,” that “[t]he repeal of all ordinances as accomplished by section two hereof shall not apply to:... (c) any ordinance, order or resolution granting any right, privilege or franchise to any person . . .”
Although the wetlands ordinance, as re-codified in 1996, did not expressly contain a “projects-in-progress” exemption, given the ordinary construction that ordinances are to be construed as prospective only, unless clear indication is given otherwise, even without consideration of the presence of a savings clause in the enacting ordinance, there is no clear indication that 1996 repeal of the “projects-in-progress” clause was intended to apply retroactively; on the contrary, there is clear evidence, by virtue of the “saving clause,” that it not have such application. As a matter of simple statutory construction, therefore, the repeal of this clause cannot apply to this plaintiff. This subdivision had obtained definitive subdivision approval from the planning board and a superceding order of conditions from the DEP, both decisions being matters of record. In 1990, and throughout 1995, it had the uncontestable right and privilege, by virtue of the “project-in-progress” clause, to be exempt from application of the wetland ordinance. As a grandfathered project, it was not disenfrancised by the 1996 repeal of the grandfather clause. Its exemption comes within the meaning of “right, privilege or franchise” as denoted in the saving clause, notwithstanding the fact that this plaintiff had laid no utility, nor built a single house at the locus, nor obtained any actual construction permits; it had changed its position substantially, in reliance upon the record as determinable at that time, by having purchased the parcel of land in question obtaining bank financing to do so. Moreover, construction had occurred on this subdivision, albeit by another, with infrastructure and homes built in phase I, prior to 1988, pursuant to the same definitive approval by the planning board and the same covenant of conditions imposed by the planning board and the superceding order of conditions imposed by the DEP that applies to this plaintiff.[15] It would, therefore, be inequitable to cause the wetlands ordinance, enacted in 1990 and originally inapplicable to this subdivision by virtue of the “projects-in-progress” clause, to be applied to this subdivision six years later by virtue of a 1996 repeal of that grandfather clause.
Therefore, for the foregoing reasons, the plaintiff is not entitled to a judgment that declares that the 1996 re-codification of the city ordinances to have been unlawful due to procedural flaws; however, it is entitled to a judgment that declares that the 1990 wetlands ordinance does not apply to it, and to include a permanent injunction that prohibits the city and its officials from enforcement of the 1990 wetlands ordinance against the Indian Hills subdivision as approved by the planning board and in accordance with the superceding order of conditions issued by the DEP, so long as the plaintiffs subdivision continues to qualify as a “project-in-progress” as defined in the wetland ordinance as written in 1990.
II. Civil Rights Violation
The plaintiff alleges that Robert Moylan, by his words and conduct at the July 2nd meeting with the plaintiffs’ representatives, and Steven O’Neil, by his letters to the plaintiff of August 6th and 7th, deprived IHA of its civil rights by threat, intimidation or coercion in violation of G.L.c. 12, §111, the state Civil Rights Act. Said statute provides for recovery of damages where a person, by threats, intimidation, or coercion, interferes with, or attempts to interfere with, a person’s exercise or enj oyment of rights secured by the *601 Constitution or laws of either the United States or of the Commonwealth. Swanset Development Corp. v. Taunton, 423 Mass. 390, 395 (1996). “We have recognized that by the Civil Rights Act, ‘the Legislature did not intend to create a Vast constitutional [and statutory] tort,’ ” and that the insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the Act. Freeman v. Planning Board of West Boylston, 419 Mass. 548, 565-66 (1995).
Turning first to the July 2, 1996, meeting in Robert Moylan’s office at the DPW, I find that the words and message intended to be conveyed by city officials, Moylan included, were not reasonably to be interpreted by the plaintiff as threats, intimidation or coercion that interfered with the rights of the plaintiff, and the plaintiff did not change any aspect of its plan as a result. Whether the words could reasonably be interpreted as an attempt to interfere with the plaintiffs rights to develop its property as planned is a closer question, but it is clear that Moylan and the other city officials present, with the possible exception of the mayor’s administrative assistant Pezzella, did not know at that time that there were no alterations to the plan that was going to satisfy the neighborhood opposition. I find that it was not the intent of the city officials present to stop or delay the development but they were also hopeful, and attempted to persuade the developers, that they and the neighbors be able to ameliorate their differences. It was their intent to ensure compliance with every covenant and regulation. Like the sought-after concession relating to a suggested re-design of an intersection referred to in Freeman v. Planning Board of West Boylston, supra, at 566, the suggestions by Moylan and the others at the July 2nd meeting, namely, for alternative access for construction and other traffic, and the reduction of traffic volume that fewer houses would represent, “legitimately related to one of the purposes of the subdivision control law.” Id. The plaintiff has not proven that the words expressed at this meeting could reasonably be understood, or were meant to convey the understanding that anyone present intended to block or alter the development by other than lawful means. See Pheasant Ridge Associates Limited Partnership v. Burlington, 399 Mass. 771, 782 (1987), and Freeman, supra, at 566, fn.18. As previously expressed, the defendants named in this count were merely putting a voice to the position that many developers must often encounter with respect to neighborhood opposition to the effect that money can be spent productively, in order to satisfy neighborhood concerns, and thereby quelling opposition, or unproductively, in litigation. The plaintiff has not satisfied its burden to prove that either defendant Moylan or O’Neil, on July 2, 1996, deprived or attempted to deprive the plaintiff of the exercise or enjoyment of its rights by threat, intimidation or coercion or that anything that occurred at the meeting of July 2nd bore any causal relationship with the actions taken by the DPW and/or the OPCD on August 6, 7 or 9. Moreover, there were no actions thereafter, by Moylan or the department of public works at his direction, that violated the state civil rights act with respect to the plaintiff. As previously discussed, the DPW was preparing for the commencement of construction as late as July 30th, and only after the city solicitor expressed his opinion of the enforceability of the wetlands ordinance against the plaintiff, and only after communications were sent from the law department to the DPW that are inferred as direction to the DPW, did its actions and intentions towards IHA change. As with the August 6th and 7th letters from O’Neil, discussed below, the rejection of the inspection permit fees by the DPW on August 9th were a direct deprivation of right through adverse administrative action, rather than an interference by threat, intimidation or coercion, notwithstanding the suspicions that were justifiable aroused by the embarrassing machinations that produced the letter of rejection.[16] “Adverse administrative action, at least when not part of a scheme of harassment, does not rise to the level of threats, intimidation or coercion. Smith v. Longmeadow, 29 Mass.App.Ct. 599, 603 (1990). In order to establish a ‘scheme of harassment’ there must be some evidence of animus against the plaintiffs or their project and an attempt to thwart the project through adverse administrative action unrelated to the legitimate municipal concerns. See Freeman, 419 Mass. at 565, n. 17.” Murphy v. Duxbury, 40 Mass.App.Ct. 513, 518 (1996). Notwithstanding the contentions of the plaintiff provoked by the directive from Moylan to his subordinates and the DPW consultant to compare the 1986 construction regulations against those applicable in 1996, I find that the plaintiff has not shown animus towards the plaintiff or its project on the part of Moylan nor that any of his actions or those of his subordinates with respect to the plaintiff’s subdivision to have been unrelated to the legitimate construction and regulatory concerns of his department and the city. I find that neither Moylan nor any of his subordinates had any intention to force IHA to comply with 1996 construction regulations and I find credible the explanation that the comparison study was commissioned to determine the differences that would be created by this construction (including those that might be considered inferior when measured against 1996 construction standards) and that it was in the interest of the DPW to learn and prepare for such differences, given the eventual transfer of the infrastructure to city ownership upon completion.
The letters from O’Neil that he issued to the plaintiff on August 6th and 7th are more problematic. The plaintiff contends they are “cease and desist” letters, the receipt of which caused the plaintiff to cease all activity. The plaintiff also contends that O’Neil had no authority to issue the letters on his own, that they were ultra vires of his duties as director of the office of planning and community development and that they were issued without the knowledge and consent of the conservation commission. O’Neil minimizes the intent and effect of the letters by refusing to acknowledge *602 them as cease and desist letters, saying instead that they were merely suggestions on his part for the plaintiff to go before the Conservation Commission to determine the applicability of the wetlands ordinance to that subdivision. The plaintiff accorded the letters their face value and stopped all actions on-site. Whether the letters were worth such respect or not, the plaintiffs decision to stop action was reasonable, causing a delay in the commencement of construction and financial harm as a consequence, included the additional cost of borrowing and delayed receipt of sales proceeds. Whether it was reasonable to incur additional and significant costs including the engineering cost associated with satisfaction of the wetlands ordinance without taking advantage of available administrative procedure, is not so easily resolved.
The plaintiff did not seek an immediate determination from the Conservation Commission as to whether the ordinance applied to it or not. Notwithstanding the events unfolding at or about the same time, especially given the return of the inspection fees by the DPW just days later, the plaintiff likely viewed such a step as futile. A common thread connecting all actions of the city departments that acted adversely towards the plaintiffs subdivision is the law department. Indeed, there were communications between the law department and O’Neil immediately prior to O’Neil’s issuance of the letters of August 6th and 7th, as well as between the law department and the DPW shortly before the inspection fees paid by the plaintiff were returned. Given the opinion announced by the city solicitor at the July 31, 1996 meeting of the city council, I find that the plaintiffs view of such a step as futile to be not entirely unreasonable. However, neither party offered evidence, legal authorities or argument on the issue of the jurisdiction and/or willingness of the commission to consider whether the wetlands ordinance would apply to this plaintiff, given the repeal of the grandfather clause, and whether and how it might interpret the saving clause as to this plaintiff, nor whether administrative review was available of any decision of the conservation commission on this point. There is support to believe that an administrative review of an interpretation by the conservation commission of a local ordinance is unavailable; therefore, a decision of the local conservation commission may be reviewed by an action in certiorari (see FIC Homes of Blackstone, Inc. v. Conservation Commission of Blackstone, 41 Mass.App.Ct. 681, 686-88 (1996)), an action that would be ripe for court review upon the filing of the administrative record and that would not have involved the kind, degree, cost and extent of time and preparations necessary prior to the trial of the within case. Notwithstanding the apparent autonomy of the conservation commission, I find that an application to that body and a decision thereon would have likely generated a request for a legal opinion, likely from the city law department, as to the applicability of the ordinance to this subdivision. Therefore, this court does not impose upon the plaintiff, as a strict jurisdictional requirement, the obligation to exhaust administrative remedies. However, given the autonomy of such a body, the result there is not viewed as a foregone conclusion. A hearing before the conservation commission thus appears to have been the only administrative process available to the plaintiff to challenge the application of the wetlands ordinance, since the city did not give notice to the plaintiff of the July 31st special meeting of the city council, nor did it provide any other means to allow the plaintiff an opportunity to be heard in connection with these administrative actions.
As O’Neil was not a member of the commission, he did not have unilateral authority to take enforcement steps without the knowledge and consent of the commission. Moreover, the plaintiff had not received any communication from the commission. Notwithstanding his lack of authority, O'Neil’s letters can fairly be viewed as adverse administrative action. Here, whether or not O’Neil was sincere in his belief that he had the authority to author and issue the letters in question, or whether he sincerely believed that the letters could not reasonably be viewed as “cease and desist” letters, I find that he issued such letters in good faith reliance upon the city law department; moreover, I find that O’Neil issued the letters in the belief that he was acting on behalf of the legitimate interests of the City of Worcester by seeking to determine the enforceability of the wetlands ordinance, a subject within the legitimate concern of several city departments, including the planning board and the conservation commission, to both of which his office provided staff assistance. In addition, I find that he relied, in good faith, upon the opinion of the law department as to the applicability of the ordinance to the plaintiff.
The actions of O’Neil in issuing the letters can also be reasonably viewed as a direct deprivation of the plaintiffs rights, as I find that the letters were reasonably viewed by the plaintiff as orders to “cease and desist,” and, therefore, constituted a deliberate effort to stop the plans of the plaintiff, as opposed to a coercive effort to force the plaintiff “to do something that it was not lawfully required to do.” Swanset Development Corp. v. Taunton, 423 Mass. 390, 396 (1996). In the case of Pheasant Ridge Associates Limited Partnership v. Burlington, 399 Mass. 771 (1987), the court addressed a land-taking, by eminent domain, found to have been undertaken as a means to block a development. The trial court found that such land-taking was coercive. The Supreme Judicial Court stated that “although the purported taking of the plaintiffs property was unlawful because done in bad faith, the taking did not itself interfere or attempt to interfere with the plaintiffs rights by coercion. The taking was an attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not do anything. Legislation, even unlawful legislation, lacks any quality of coercion when that legislation seeks to eliminate the rights of a person and does not seek to force that person unwillingly to do or not do something *603 otherwise lawful.” At p. 781. Likewise, the letters herein were improperly issued but were also direct and preemptive, and sought to eliminate the right of the plaintiff to proceed without application to the conservation commission, notwithstanding the ultra vires nature of the authorship of the letters. The plaintiff has not offered persuasive evidence that the actions of the defendants were inspired by any intent other than to enforce the wetlands ordinance.
The actions of both the DFW, under Moylan, and O’Neil, came as a result of the opinion of the city-solicitor that the 1990 wetlands ordinance, as recodified in 1996, applied to the plaintiff. The kind and/or quality of their actions, relying upon an interpretation of law, albeit erroneous, was no more coercive, even if committed in bad faith, than the actions of the town of Burlington, in the Pheasant Ridge case, supra; an erroneous interpretation of law is no worse than and, therefore, not significantly different than unlawful legislation or the unlawful landtaking. In Pheasant Ridge, the Supreme Judicial Court found inadequate support in the summary judgment record for the element of coercion required by an allegation of violation of the state civil rights and reversed the decision in the trial court. Similarly, in the case of Freeman v. Planning Board of West Boylston, 419 Mass. 548 (1995), the Supreme Judicial Court reversed a judgment after trial that had been based upon a finding of a violation of both state and federal civil rights act in connection with a planning board having first withheld subdivision approval, and subsequently, an approval conditioned on intersection redesign, in an attempt to force a developer to redesign an intersection contrary to its authority. The facts herein on the issue of threat, intimidation or coercion are no more egregious than those in Pheasant Ridge, nor Freeman, supra; thus, the case at bar is controlled by said decisions. (See also Swanset Development Corporation v. City of Taunton, 423 Mass. 390 (1996).) The plaintiff has not met its burden of proof that the statements and/or actions of Moylan or O’Neil were a deprivation of its rights by threat, intimidation or coercion. Consequently, it has not satisfied its burden to prove by a preponderance of the evidence that either defendant committed a violation of the state civil rights act.
III. Civil Conspiracy
The plaintiff alleges that Hoover, Mariano, Moylan and O’Neil[17] intentionally and unlawfully combined to prevent it from developing this approved subdivision. In particular, IHA contends that one or more of the defendants either committed or knowingly assisted or encouraged another in the commission of the following alleged unlawful acts: (a) Hoover, as an abutter to the subdivision, either participated, in violation of conflict of interest laws, or failed to distance himself from the appearance, at least, of participation in various meetings and communications regarding the subdivision, (b) Mariano was interested in stopping the plaintiffs development of the subdivision by any means possible, thus achieving the political result of appeasing neighborhood opposition; this included, according to the plaintiff, his violation of the city charter prohibiting his giving orders or directions to city employees to find the means to prevent the subdivision from being built; and/or (c) defendants’ selective enforcement of the wetlands ordinance, given the repeal of the grandfather clause, against the plaintiff The plaintiff alleges a civil conspiracy existed between or among the defendants since they knew, or upon the use of reasonable judgment should have known, that the foregoing actions were unlawful and, jointly agreed to assist in the commission of these actions by the issuance of orders in order to deprive and that actually deprived the plaintiff of its right to develop its property as had been earlier approved.
One text notes that “one of the earliest judicial expressions of the intentional tort of civil conspiracy is found in Carew v. Rutherford,” (106 Mass. 1, (1870)), which stated, at p. 10, that “the acts charged are alleged to have been done in pursuance of a conspiracy. On this point, if two or more persons combine to accomplish an unlawful purpose, or a purpose not unlawful by unlawful means, their conduct comes within the definition of a criminal conspiracy as stated in Commonwealth v. Hunt, cited above. If, in pursuance of such a conspiracy, they do an act injurious to any person, he may have an action against them to recover the damage they have done him.” Nolan and Sartorio, Tort Law, §99, p. 134.
“Under Massachusetts law, two types of civil conspiracies exist.” Grant v. John Hancock Mutual Life Insurance Co., 183 F.Sup.2d 344, 362 (D.Mass. 2002); Kurker v. Hill, 44 Mass.App.Ct. 184, 188 (1998) (citation omitted). The first type of civil conspiracy is a coercive conspiracy. “The element of coercion has been required only if there was no independent basis for imposing tort liability — where the wrong was in the particular combination of the defendants rather than in the tortious nature of the underlying conduct.” Kurker v. Hill, 44 Mass.App.Ct. 184, 188 (1998) (citation omitted). This first type of civil conspiracy, “sometimes called ‘true conspiracy,’ ... is a ‘rare’ . . . and ‘very limited’ cause of action.” Massachusetts Laborers’ Health & Welfare Fund v. Philip Morris, Inc., 62 F.Sup.2d 236, 244 (1999) (quoting, in part, Fleming v. Dane, 304 Mass. 46, 50 (1939)). “The plaintiff must allege and prove that by ‘mere force of numbers acting in unison’ the defendants exercised ‘some peculiar power of coercion of the plaintiff which any individual standing in a like relation to the plaintiff would not have had.’ ” Id. (citing Fleming). “The exercise of this ‘peculiar power of coercion’ is itself the wrong, and no other tortious act need be shown.” Id.
It does not appear from the evidence or arguments of the plaintiff that its claim of civil conspiracy is dependent upon this first form. Moreover, the plaintiff *604 has not produced sufficient evidence that two or more of the four individually named defendants formed any agreement, express or implied, to act in concert with each other and by virtue of the force of numbers to improperly deprive IHA of any rights it might have possessed to proceed with construction of the subdivision. It is clear that it was not the coercive force of numbers, as opposed to the individual actions of any one or more of the defendants upon which the plaintiffs contentions rest.
The second type of civil conspiracy “derives from ‘concerted action,’ whereby liability is imposed on one individual for the tort of another.” Kurker v. Hill, 44 Mass.App.Ct. 184, 188 (1998) (citations omitted). Under this type of civil conspiracy, “a person may be liable in tort if he ‘knows that the ... conduct (of another person) constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.’ ” Kurker v. Hill, 44 Mass.App.Ct. 184, 189 (1998) (quoting the Restatement (Second) of Torts §876(b) (1977)).Thus, this second type of civil conspiracy “extends liability to those who assist or encourage others to commit torts without necessarily any proof either of a ‘peculiar power of coercion’ or even of an explicit agreement among the defendants . . . IT]he ‘concerted action’ version simply defines who may be liable for other torts.” Massachusetts Laborers’ Health & Welfare Fund, 62 F.Sup.2d 236, 244 (1999) (citing DesLauries v. Shea, 300 Mass. 30, 33-34 (1938)). See Beck v. Prupis, 529 U.S. 494, 504 (2000) (“It is the civil wrong resulting in damage and not the conspiracy which constitutes the cause of action” (citation omitted)). “Key to this cause of action is a defendant’s substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan. ‘In the tort field, the doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the results.’ ” Kurker v. Hill, supra.
Common threads that appear to weave through the plaintiffs claim is that Hoover’s status as an abutter to the proposed subdivision provided the means for the defendants’ concerted effort to deprive the plaintiff of its development rights, either through Hoover’s direct involvement in the process in violation of state conflict of interest law, or indirectly, through inaction, by allowing a vacuum of leadership in the administration of city departments to be filled by Mariano, in violation of the city charter.[18]
The State Conflict of Interest Law, G.L.c. 268A, §§19 and 23 et seq., applies to all officials, employees, and agents of the City of Worcester. G.L.c. 268A, §19, prohibits a municipal employee from participating in a particular matter if he, certain family members, or business associates, has a financial interest. “Participate” is defined in Section l(j) of c. 268A, as to "participate in agency action or in a particular matter personally and substantially as a . . . municipal official, through approval, disapproval, decision, recommendation, the rendering of advice, investigation or otherwise.” Chapter 268A does not define “financial interest.” Section 23(b)(2) thereof prohibits municipal officers and employees from using or attempting to use official positions to secure unwarranted privileges or exemptions of substantial value that are not available to similarly situated individuals. Subsection (b)(3) prohibits municipal officers and employees from acting in a manner that would cause a reasonable person to conclude that a person can improperly influence the person in the performance of his or her official duties.
Hoover was, at all relevant times, an abutter to this phase of the subdivision, having purchased a home constructed as part of the first phase. As early as October 1995, when he began to receive inquiries from his neighbors concerning activities observed by them on the undeveloped portion of the subdivision locus and began to observe activities himself, he issued a request for information to O’Neil concerning its status. Thereafter, he made oral inquiry of the city solicitor concerning his status as an abutter. He was told that he was conflicted and could not participate. He took no steps, though, to name any other city employee as the person in the administration in charge of the actions of the city administration, vis-a-vis, this subdivision. Although he informed some members of the city administration of his conflict, he allowed reports and memoranda to and from city departments to continue to be addressed to and over his name, even into mid-July 1996. He requested his administrative assistant to transmit all necessary memoranda to department heads as needed, including directions to attend neighborhood meetings and meetings with the mayor.
Although the plaintiff has proven that Hoover was present for a portion of the July 24th meeting in the mayor’s office, and notwithstanding the apparent failure of the city manager to immediately distance himself from all administrative contact with this subdivision, a failure that included his ordering O’Neil, in October 1995, to commence a review of this subdivision and later, in allowing memoranda to pass to and from his office over his name, for example, he has not proven that the city-manager actively “participated” in any order or decision of the city significant to any aspect of this case. Nor do I find that any order or decision of the city, by and through Moylan or O’Neil, was done at the direction or encouragement of Hoover or for the purpose of favoring Hoover or for his advantage. However, passively, by inaction or omission, inadvertently allowed these heads of department, key subordinates and others to perceive the mayor as directing the city response since he neither deputized any single administrator to manage the city’s response to the plaintiff’s activation of this subdivision, nor prohibited city department leaders from direct interaction with Mariano on the occasions of the meetings in the neighborhood and at the meeting on July 24th. The failure to name a fully authorized administrative man *605 ager to act in his stead with respect to this subdivision may well have created an appearance to his subordinates that a direct chain of communication between them and the mayor was permissible, and in so doing he may have fatted to screen them from oppositional influences created in the neighborhood and being apparently espoused by the mayor. The plaintiff has failed to prove, however, that Hoover “participated” in any decision or action of the city in violation of law and failed'to prove that any other defendant combined with him to interfere with the plaintiffs rights. What the plaintiff has proved is that there was a confluence of factors that were negligent at worst, all of which stem from an erroneous interpretation of law by the city solicitor by his opinion that the wetlands ordinance applied to the plaintiff. Notwithstanding the intentional nature of the orders contained in the letters of August 6th, 7th and 9th, they all were issued upon the advice or direction of the city law department and in reliance upon its legal opinion of July 31.
Until it became known that the city solicitor was issuing a written opinion that the wetlands ordinance was applicable to this subdivision, made public at the meeting of July 31st, this development was on track to receive all necessary permits for the commencement of construction, as evidenced by its representatives having attended a pre-construction meeting on July 30th at the DPW. Although Moylan and his subordinates, and O’Neil knew that the subdivision was subject to the application of a covenant with the planning board and construction regulations, neither official had any knowledge of the deletion of the grandfather clause in the wetlands ordinance, nor did they know of any reason or method for delaying or blocking the construction of the subdivision or did they have any intent to do so. Moreover, no orders or decisions contrary to the plaintiffs position were made and/or communicated by any city official until after July 31.
I find that the letters written and issued by O’Neil on August 6th and 7th and the decision of the DPW to return IHA’s payment of inspection fees on August 9th were all made by reason of the asserted applicability of the wetlands ordinance and, inferentiafly, at the direction of the law department, consistent with the opinion expressed by the city solicitor. As intently as Mariano’s interest appeared to satisfy the neighborhood opposition by searching for methods for it to be blocked, including the application of pressure upon city department heads to find the means to do so, the plaintiff has not shown that the orders from either O’Neil or the DPW[19] were at the direction or insistence of Mariano or Hoover.
I find that the construction of phase H of the Indian Hill subdivision was delayed in 1996 as a direct and proximate result of the actions of the city law department in advising or directing the DPW to return the inspection fees and advising or directing O’Neil to issue the letters of August 6 and 7, both of which actions were expressly on the ground that the plaintiff was subject to the wetlands ordinance. I find further that neither the actions of Moylan or his subordinates, nor of O’Neil were initiated in concert between or among two or more defendants, nor were these orders initiated of their own accord. Furthermore, there is no evidence to indicate that these defendants were in a position to question the soundness of the legal opinion being expressed by the city solicitor. The interpretation of the re-codified ordinances, in connection with the deletion of the “projects-in-progress” clause, coupled with the presence of a “saving clause” in the repeal/re-codification ordinance, does not lend itself to so simple a resolution as would place these department heads on notice that the city solicitor was clearly and obviously mistaken. The court’s analysis is dependent upon an interpretation of law, given the circumstances of this case, that definitive subdivision approval together with a superceding order of conditions from the DEP constitutes a sufficiently substantive property right so as to entitle it to be free from a retroactive application of law, a result that is not so clearly established so as to be obvious to the defendants herein, including Hoover and Mariano, both of whom having had the benefit of the city solicitor’s executive summary. All of the defendants had been previously unaware of the deletion of the “projects-in-progress” exemption and none had performed a section-by-section comparison between the new and the old revi90 sions. [20]
Although the plaintiff has shown that an oppositional atmosphere towards the plaintiff was created by the neighborhood opposition and is a position that appears to have been adopted by the mayor, and who, in turn, sought to encourage, within the city administration, a search for any lawful method to ensure compliance with every law that possibly applied to this subdivision, and to block it if legally possible, the plaintiff has not proven that the administrative orders and actions of the defendants were brought about as a direct and proximate result of Mariano nor that the mayor combined with any other of the named defendants who then acted pursuant to such an agreement to injure the plaintiff and to carry out the plan by a series of connected unlawful actions that deprived the plaintiff of its rights. While it is true that the letters from O’Neil were issued ultra vires, the plaintiff has not shown that they were issued at the insistence or with the assistance of any other defendant. The plaintiff has not produced any evidence to show or suggest that the administrative actions adverse to the plaintiff were the result of any agreement or combination of defendants intending to deprive the plaintiff of its rights to develop its property.
The plaintiff also contends that the defendant city officials singled it out from all other subdivisions similarly situated by enforcement of the wetlands ordinance against it but no other subdivision or con *606 struction project then in progress, in violation of the equal protection clause of the constitution. The Fourteenth Amendment to the United States Constitution does not permit unequal application of impartial laws. Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886). The denial of equal protection of the laws occurs where a person, compared with others similarly situated, is selectively treated and such selective treatment is based on (a) impermissible considerations such as race, sex, or religion; (b) an intent to inhibit or punish the exercise of constitutional rights; or (c) a malicious or bad faith intent to injure. Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995).
Whether entities are “similarly situated” for equal protection purposes is an objective test; “whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners.” Barrington Cove v. Rhode Island Housing, 246 F.3d 1, 8 (1st Cir. 2001), quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989). Accord Schultz v. Kelly (D.Mass. 2002). To meet its burden of proof, a plaintiff “must ‘identify and relate specific instances where persons situated similarly in all relevant respects were treated differently, instances which have the capacity to demonstrate that. . . [the plaintiff] . . . was singled out for unlawful oppression.’ ” Schultz v. Kelly (D.Mass. 2002), 2002 WL 264765 at *13 (citation omitted). Otherwise, a selective enforcement claim “cannot survive.” Id. (citation omitted).
Here, the plaintiff offered only anecdotal evidence that since another subdivision owned and under development by the plaintiff in another part of the city was not subjected to the wetlands ordinance as Indian Hill was, and since the city was unable to identify other projects that were in progress at the relevant time that may be subject to the ordinance and which was applied to it, and conducted no survey of the projects then in progress to which the wetlands ordinance should also be applied, then IHA must have been singled out for selective enforcement of the ordinance due to the defendants’ bow to neighborhood pressure. However, the plaintiff offered no detailed evidence from which one can conclude that the two subdivisions referenced in the testimony were substantially similar in all relevant aspects. Nor does it offer evidence of any other projects in progress in 1996 that were in progress prior to and, therefore, originally exempt from application of the 1990 wetlands ordinance by virtue its grandfather clause. More significantly, however, although the plaintiff has introduced evidence of strong neighborhood opposition at Indian Hill, and that the mayor may have found it politically expedient to champion their cause, the plaintiff has not proven that the administrative actions taken by one or more of the defendants that caused delay and additional cost in the construction of the subdivision was the product of an irrational or malicious campaign by the defendants and that it was singled out for enforcement of the ordinance while others were not. As with the allegations of state civil rights violations and civil conspiracy discussed above, the actions taken by the city officials were either the product of, or superseded by the erroneous opinion of the city solicitor and which actions could have been tested by administrative review before the Conservation Commission; moreover, should success there have been unavailing, an action in certiorari for judicial review was available.
In the case of Baker v. Coxe, 230 F.2d 470 (1st Cir. 2000), a case relied upon by the plaintiff to support its equal protection/selective enforcement claim, the court described the facts in the 1995 case of Rubinovitz v. Rogado, 60 F.3d 906 (1st Cir. 1995), also relied upon by the plaintiff: “a city official was alleged to have engaged in a vendetta against a landlord who had evicted her friend by enlisting other government officials from various departments to cut off the landlord’s gas, water, and sewage services, to charge the landlord with building code violations, and to frustrate relations with a contractor. Not only did the spumed tenant’s avenger wreak havoc on the landlord in multiple ways, but there was not the slightest vestige of any legitimate government purpose served.” At 474. In distinguishing the treatment to which the Bakers were subjected as “more benign” from that in Rubinovitz, the Baker court noted that the plaintiff in Rubinovitz “had adduced ‘only barely enough evidence’ to survive summary judgment,” and which “illustrates the extreme ‘malicious orchestrated campaign’ needed to surmount the constitutional threshold.” At 474. In affirming the trial court’s dismissal of the equal protection and due process claims therein, the Baker Court stated:
In the field of local permits, the nature of the government conduct (or misconduct) required to establish either a substantive due process or an equal protection claim is so similar as to compress the inquiries into one ... In equal protection cases, we have articulated the need to establish a “gross abuse of power, invidious discrimination or fundamentally unfair procedures.” ... In substantive due process cases, we have required proof of an “abuse of power that shocks the conscience, or action that is legally irrational.”
We have held that even an arbitrary denial of a permit in violation of state law — even in bad faith— does not rise above the constitutional threshold for equal protection and substantive due process claims . . . We have thus observed a marked difference between the inevitable misjudgments, wrongheadedness, and mistakes of local government bureaucracies and the utterly unjustified, malignant, and extreme actions of those who would be parochial potentates.
At 474. [Internal citations omitted.]
Here, even if the actions of the defendants can be viewed as arbitrary, capricious or even in bad faith, *607 the plaintiff has not shown that such actions deprived it of the equal protection of the law; the plaintiff has not shown that the actions of any defendant were more egregious than those in Baker, Freeman or Pheasant Ridge, supra or based upon either impermissible considerations such as race, sex, or religion, or with intent to inhibit or punish the exercise of constitutional rights or with a malicious or bad faith intent to injure. The link common to the administrative actions of the defendants was the belief, inspired by a written opinion of the city solicitor, that the wetlands ordinance applied to this plaintiff. Although the opinion upon which that belief was based was erroneous, protection of wetlands resources was within the legitimate interest and concern of the city and its officials and, therefore, rational. IHA has not proven that it was deprived of its right to the equal protection of the laws in connection with its right to develop its property.
The plaintiff has thus failed to sustain its burden to prove, by a preponderance of the evidence, the existence of a civil conspiracy between or among the defendants to deprive or interfere with the plaintifFs right to develop its property.
ORDER FOR JUDGMENT
Therefore, and for the foregoing reasons, a judgment shall enter, in favor of the plaintiff on count I of its complaint, that declares that the plaintiff is exempt from the application of Chapter 6 of the 1996 Revised Ordinances of the City of Worcester, the wetlands ordinance, so long as it is and continues to be a “project-in-progress” as defined in Section 18 of Chapter 18 of the 1986 Revised Ordinances of the City of Worcester, as amended. In addition, the defendants are permanently enjoined from enforcement of the said wetlands ordinance, as against it, for so long as it is and continues to qualify as a “project-in-progress” as defined therein.
With respect to counts II and HI, a judgment shall enter in favor of the defendants, dismissing said counts of the plaintiffs complaint.
*608 direct or request the appointment of any person to, or his/her removal from, office by the city manager or any of his/her subordinates, or in any manner take part in the appointment or removal of officers and employees in that portion of the service of the city for whose administration the city manager is responsible. Except for the purpose of inquiry and as otherwise provided in section 2-8 of this charter [officers elected by the Council], the city council and its members shall deal with that portion of the service of the city as aforesaid solely through the city manager and neither the city council nor any member thereof shall give orders to any subordinate of the city manager either publicly or privately.

In light of the decision of the court, no action is deemed necessary. The defendants’ motions, filed under Rule 41 (b) (2), essentially seek a determination on the merits of the plaintiffs evidence which is co-terminus with the ultimate decision.

The evidentiary record was allowed to remain open for one final exhibit, a construction phasing plan that had been referenced in the testimony of David Mathias, a principal of the plaintiff, but which was unavailable at that time. Counsel were unable to agree as to the actual exhibit intended for admission and a hearing was thus necessitated, which did not occur until June 28, 2002. Exhibit 73 was received at that time.

Although testimony concerning this subdivision was not extensive, I infer and find, therefore, that construction permits had been issued and substantial construction underway long before the 1996 recodification of the city ordinances. Although there was testimony from David Mathias that, in order to develop 5 lots originally thought to be undevelopable, additional to the original 27 approved, they had to return to the Conservation Commission. The testimony did not disclose when, in relation to the recodification, that this occurred, whether it required a new certificate of conditions for the entire project and whether it came at a time when the Conservation Commission knew of the deletion of the “project-in-progress" exemption.

A “mayor’s walk,” as created and/or practiced by Mariano, was an informal, publicized, outdoors stroll of a given neighborhood where the mayor would typically invite other members of the city council and members of the city administration to be available to meet residents and discuss their concerns on any given issue.

Indian Hill is, as one might expect, a hill. In order to improve pressure in the water lines of the area, the DFW maintains a water tank on top of the hill.

On July 23, 1996, a response to the June 18, 1996 council order concerning notification to abutters was transmitted to the city council which stated that the notification given to the abutters for the 1986 planning board approval was legally sufficient. (Ex. 33.) The matter was then “placed on file,” a city council action which indicates the council has no plans for any future debate on the item.

Sala Street was no more than a path through the woods barely large enough to drive a car over. Within a week of the July 2, 1996 meeting Moylan learned from his staff that the Sala Street alternative was not feasible due to its terrain and probable wetlands. IHA was advised of this determination by DPW employee Paul Moosey.

At all times relevant hereto, Moylan, O’Neil and Mariano were aware that, under the city charter, the city manager is the chief executive of the city and the official to whom Moylan and O’Neil report, and that Mariano held the position of a ceremonial mayor with no authority to direct the work of subordinates of the city manager such as Moylan or O’Neil.

Councilor Patton was so discomforted by this meeting that subsequent thereto, he contacted Attorney Finkelstein, whom he knew from the attorney’s previous employment with the city. Patton told Attorney Finkelstein of his concern about the tone and tenor of Mariano at the meeting and wanted to make Attorney Finkelstein aware of such. Patton also advised Finkelstein that Hoover was present for a part of the meeting in Mariano’s office although he did not speak. Moreover, Patton told Finkelstein that Mariano gave “directives” to the department heads represented that he (Patton) distinguished in testimony as something different than “giving orders.”

The notice to the Worcester Conservation Commission was sent by letter in care of the city office of planning and community development and by calling O’Neil on the telephone. The city office of planning and community development, of which O’Neil served as its director, was the city department responsible for providing staff assistance to the planning board, the zoning board of appeals and the conservation commission. He, himself, was not an inspector for the commission nor did he provide supervisory authority over the city employee providing inspection services for the commission.

The defendants’ motion to dismiss count K, to the extent that it names the defendants in their official capacities, is allowed, for the reasons expressed therein.

The plaintiff also challenges the manner in which the reorganization plan was proposed and enacted, complaining that a required public hearing by an appropriate councfi committee was not held. See §6-1 (b) of Article Six of the city charter. The plaintiff has not satisfied its burden to prove how this particular defect impacted it other than as another opportunity for it to have obtained notice of the proposed re-codification and possibly knowledge of the deletion of the “project-in-progress” exemption.

The plaintiff does not contest the city’s right to enact a wetlands ordinance that is more restrictive than the Wetlands Protection Act. See Southern New England Conference Ass’n of Seventh-Day Adventists v. Town of Burlington, 21 *608 Mass.App.Ct. 701 (1986), further review den’d, 397 Mass. 1103 (1986).

The analysis as to whether a statute, or an ordinance, ought to be allowed to apply retroactively to a given situation now involves more than merely resolving the question of whether the alleged rights involved are vested or substantive. Indeed, to determine whether a statute may constitutionally be applied retroactively, a "reasonableness” test has been set out by the Supreme Judicial Court due to the “difficulty to determine whether a right [therein, of recovery) is remedial or punitive, vested or inchoate, substantive or procedural.” Parrello v. McKinney, 46 Mass.App.Ct. 785, 790 (1999), citing American Manufacturers Mutual Ins. Co. v. Commissioner of Insurance, 374 Mass. 181 (1978). In that case, the court explained that such a “test is determinative of all arguments of the plaintiffs, since we perceive no need for separate analysis of their various contentions under the impairment-of-contracts clause and under the due process clause of the United States Constitution and cognate State constitutional provisions." Id., at 190, The court went on to describe three viewpoints from which to determine reasonableness: “the nature of the public interest which motivated the Legislature to enact the retroactive statute; the nature of the rights (in this instance the plaintiffs’ asserted rights) affected retroactively; and the extent or scope of the statutory effect or impact.” American Manufacturers, supra, at 191. Even in the absence of a “saving clause,” the repeal of the exemption from the wetlands ordinance in question could not stand under the reasonableness analysis. To allow a project in progress to proceed unaffected by subsequent and more restrictive ordinances or regulations is not necessarily inconsistent with the public interest. See Citizens for Responsible Environmental Management v. Attleboro Mall, Inc., 400 Mass. 658 (1987).

The cily implied, if not expressed, its concern with the need to confront changing and problematic conditions, such as erosion and other environmental concerns, apparently caused or experienced from construction of the first phase of this subdivision. The municipality was not entirely powerless to effect some change in the plan, however. Although upon approval, whether preliminary or definitive, a subdivision gains certain protections from the application of post-approval amendments to zoning laws and amendments (see G.L.c. 40A, §6), even upon modification or rescission by the planning board under G.L.c. 41, §81W, the board clearly retains its authority to order changes to the plan. “We caution against confusing the rights and obligations of a planning board under the subdivision control law and its rights and obligations under the zoning laws.” Heritage Park Development Corp. v. Town of Southbridge, 424 Mass. 71, 75 (1997). From the evidence, it does not appear that any such further planning board activity occurred here, however, at any time following the original definitive approval in 1986. Moreover, the planning board and department of public works retain jurisdiction to ensure that the subdivision complies with the applicable covenant, planning board regulations and construction methods and material.

The letter dated August 9, 1996, bore a handwritten name of D.P.W. Principal Engineer Edward Carrigan and the initials “TCR” for Timothy C. Reiner. Edward Carrigan testified that he did not write the letter, did not authorize the letter, and did not authorize anyone to initial the letter. The letter was written by Moosey and signed and initialed by another D.P.W. employee, Bob Fiore, who had no authority to sign for Carrigan, Reiner or any employee or official. Testimony from Moosey and Moylan established that although Fiore signed the letter as a “joke,” it was intended to be sent. (Ex. 14.)

The plaintiff originally named the City of Worcester as an additional defendant with respect to this count. However, the city obtained summary judgment in its favor on this count on the ground that “the municipality is immune from liability for intentional torts.” (See endorsement and order of the court, Hillman, J., entered on May 17, 2000, with respect to docket paper no. 25.)

Under the Charter, the Mayor is a ceremonial elective office who also serves as a member of the City Council as a “councillor at large.” Charter, §2-2(b). The Charter specifically prohibits members of the City Council to:

I find that the maimer in which the DPW letter of August 9th was authored and issued, while unorthodox and justifiably arousing suspicion, was not unlawful, as it was the intention, upon the direction of the law department, that it be issued by the DPW. While the contortions which led to the issuance of the letter may evince a lack of confidence in the correctness of the basis for the letter, they do not demonstrate bad faith nor evidence of an illegal combination.

Notwithstanding the subtleties that would be encountered by a non-lawyer in an attempt to analyze the soundness of the opinion of the city solicitor, Moore is not inhibited by such limitations. Indeed, given his greater knowledge of and personal experience with the re-codification, the provenance of his advice is understandably questioned by the plaintiff, who contends that the defendants should be held to know of its obvious error and that reliance thereon should be deemed unreasonable. Moore, as the author of the July 31, 1996, opinion letter to the City Council, was also the author of the May 4, 1995 letter to Hoover and an “executive summary” of the re-codification, both of which accompanied Hoover’s transmittal to the city council, in which it was stated that no changes of substance were intended by the re-codification. The deletion of a grandfathering provision is a change that affects substantive rights. Although customary rules of statutory construction do not permit examination of a legislative history in the absence of ambiguity, it does appear that Moore’s opinion of July 31, 1996, is significantly inconsistent with his letter of transmittal to Hoover on May 4, 1995, and the summary in which he states as regards Chapter Six-Wetlands Protection: ”[t]his is an unchanged version of 1986 chapter 17 (Wetlands Protection’) . . [Emphasis added.] Although there may be other explanations for this opinion, at the very least it appears that Moore did not appreciate the significance of or the substantiveness that the deletion of a grandfather clause would present and appears to have ignored the force of precedent governing retroactive application of law and the significance to the analysis of a “saving clause.” During the trial, Hoover testified that he had not known or realized that “grandfather” clauses from this and other chapters of the ordinances were being removed, contrary to interrogatory answers signed by him in which it was stated that these “grandfathering” provisions were being removed intentionally. The interrogatory answers are thus contrary to the stated purpose of the re-codification as well as Hoover’s live testimony and are discredited. In any event, the greater knowledge of the city solicitor cannot be attributed to the defendants; they are not responsible for the error of his opinion nor can they be held actually or vicariously liable for it.